KEKER, VAN NEST & PETERS LLP
JOHN W. KEKER - # 49092
jkeker@keker.com
ELLIOT R. PETERS - # 158708
epeters@keker.com
ELIZABETH K. MCCLOSKEY - # 268184
emccloskey@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant
CHRISTOPHER LISCHEWSKI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:18-cr-00203-EMC |
| Plaintiff, | **MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR AN ORDER THAT THE RULE OF REASON APPLIES** |
| v. | |
| CHRISTOPHER LISCHEWSKI, | Date:        May 7, 2019<br>Time:        2:30 p.m.<br>Dept.        Courtroom 5 - 17th Floor<br>Judge:       Hon. Edward M. Chen |
| Defendant. | |
| | Date Filed:  May 16, 2018 |
| | Trial Date:  November 4, 2019 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................................1

II.    BACKGROUND ............................................................................................................2

III.   ARGUMENT...................................................................................................................5

      A.    The caution Mr. Lischewski advocated with regard to environmental claims on tuna labels was not unlawful but, much to the contrary, mandated by law....................................................................................................6

      B.    Even if the alleged agreement about "FAD free" tuna might be unlawful, it cannot be unlawful per se, but must be evaluated under the rule of reason. ...........7

      C.    Because the indictment alleges a single conspiracy comprising an agreement that is not unlawful, much less unlawful per se, the case should be dismissed. ..................................................................................................12

      D.    If the Court allows the Government to separate its duplicitous charges, the charge relating to "FAD-free" tuna must be dismissed because the alleged agreement is not unlawful, and because that charge is time-barred. .....................13

      E.    At the very least, the Court should hold that the Government's allegations relating to "FAD-free" tuna are subject to the rule of reason. ...............................13

IV.   CONCLUSION............................................................................................................14

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>**Page(s)**</u>

3

**Federal Cases**

4

*Cal. Dental Ass'n v. F.T.C.*,
5
    224 F.3d 942 (9th Cir. 2000) ...................................................................................................9

6

*Cal. Dental Ass'n v. F.T.C.*,
7
    526 U.S. 756 (1999).................................................................................................8, 9, 10

8

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
    363 F.3d 761 (8th Cir. 2004) ............................................................................................9, 11

9

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
10
    551 U.S. 877 (2007)...........................................................................................8, 10, 11

11

*Nat'l Ass'n of Review Appraisers & Mortg. Underwriters, Inc. v. Appraisal Found.*,
12
    64 F.3d 1130 (8th Cir. 1995) ...........................................................................................9

13

*In re Packaged Seafood Prod. Antitrust Litig.*,
14
    2017 WL 35571 (S.D. Cal. Jan. 3, 2017)..............................................................................10

15

*Paladin Assocs., Inc. v. Mont. Power Co.*,
    328 F.3d 1145 (9th Cir. 2003) ...........................................................................................9

16

*State Oil Co. v. Khan*,
17
    522 U.S. 3 (1997)...........................................................................................................8, 13

18

*United States v. Aguilar*,
    756 F.2d 1418 (9th Cir. 1985) .........................................................................................12

19

*United States v. Bonds*
20
    2008 WL 618911 (N.D. Cal. Mar. 4, 2008)..................................................................12, 13

21

*United States v. Bonnar*,
22
    2008 WL 4460267 (W.D. Wash. Oct. 1, 2008) .............................................................12, 13

23

*United States v. Kelly*,
    874 F.3d 1037 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 2038 (2018).........................................5

24

*United States v. Kemp & Assocs., Inc.*,
25
    907 F.3d 1264 (10th Cir. 2018) .................................................................................13, 14

26

*United States v. Nukida*,
    8 F.3d 665 (9th Cir. 1993), *aff'd*, 87 F.3d 1324 (9th Cir. 1996) (unpublished)..........................5

27

28

**Federal Statutes**

15 U.S.C. § 45 ................................................................................................6, 7, 10

15 U.S.C. § 4301 ....................................................................................................11

15 U.S.C. § 4302 ....................................................................................................11

18 U.S.C. § 3282 ....................................................................................................13

**Rules**

Fed. R. Crim. P. 12 ..............................................................................................5, 14

**Regulations**

16 C.F.R. § 260.1 ..............................................................................................6, 7, 10

16 C.F.R. § 260.2 ................................................................................................1, 6

16 C.F.R. § 260.3 ..............................................................................................6, 7, 13

16 C.F.R. § 260.4 ................................................................................................6, 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD IN THIS ACTION:**

**PLEASE TAKE NOTICE** that on May 7, 2019, at 2:30 p.m. or as soon thereafter as counsel may be heard in Courtroom 5, 17th Floor of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Christopher Lischewski will and hereby does move the Court, pursuant to Federal Rule of Criminal Procedure 12(b), to dismiss the indictment, or in the alternative, for an order holding that the rule of reason applies.

This motion is based upon the instant notice, the following Memorandum of Points and Authorities, the accompanying Declaration of Nicholas S. Goldberg and the exhibit attached thereto, oral argument, and the pleadings and exhibits on file with the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

The Government seeks to hold defendant Christopher Lischewski criminally liable for following the law and exercising his First Amendment rights.  The Government contends that Mr. Lischewski violated the antitrust law by pushing back, on behalf of Bumble Bee Foods, LLC, and the International Seafood Sustainability Foundation ("ISSF"), against Greenpeace's demonization of the use of "Fish Aggregating Devices," or "FADs"—floating structures that attract fish, which are then scooped up in large nets called purse seines.  Bowing to pressure from Greenpeace, some retailers have put out brands labeled "FAD-free," touting them as more "sustainable."  As Mr. Lischewski, Bumble Bee, ISSF, and others in the tuna industry noted, however, such branding is misleading because it makes "environmental marketing claims" that are unsubstantiated by "competent and reliable scientific evidence," 16 C.F.R. § 260.2, and "overstate, directly or by implication, an environmental attribute or benefit," *id.* § 260.3(c).  It cannot be unlawful to follow the law by refusing to make such misleading claims.  This Court, therefore, should dismiss the sole count of the indictment, which duplicitously alleges a single overarching conspiracy including the alleged agreement not to make "FAD-free" branding claims—an agreement that cannot be unlawful, and certainly cannot be unlawful *per se*.  If the Government is allowed to

1320671

separate its meritless claim about "FAD-free" tuna from its claim of an alleged price-fixing

conspiracy, the former, at least, must be dismissed—not only because the conduct at issue is

lawful and protected by the First Amendment, but also because the claim is time-barred.  At the

very least, the Court should hold that the Government's allegations relating to "FAD-free" tuna

are subject to the rule of reason.

## II.     BACKGROUND

On May 16, 2018, the grand jury returned a one-count indictment against Christopher

Lischewski, who was the Chief Executive Officer of Bumble Bee and former Chair of the Board

of Directors of ISSF.  The indictment alleges a single, overarching conspiracy spanning from

November 2010 through December 2013 "to suppress and eliminate competition by fixing prices

for packaged seafood sold in the United States."  Dkt. No. 1 (Indictment) ¶ 7.  The indictment

contains one paragraph describing the means and methods of the conspiracy, which is focused on

purported agreements to fix prices of canned tuna.  *See id.* ¶ 10.  The Government alleges that Mr.

Lischewski and unidentified coconspirators agreed, during "meetings, conversations, and

communications," on prices for packaged seafood sold in the United States; "collected,

exchanged, monitored, and discussed information on prices . . . for the purpose of reaching

agreements on prices and monitoring and enforcing adherence to" the supposed agreements;

"issued price announcements and pricing guidance" in accordance with the supposed agreements;

sold and accepted payments for packaged seafood "at collusive and noncompetitive prices"; and

provided "misleading justifications for prices."  *Id.*

In addition to these price-fixing allegations, however, the Government alleges in one sub-

paragraph of the indictment that Mr. Lischewski and unidentified coconspirators agreed to "limit

and restrict competition . . . for products based on certain types of fishing methods."  *Id.* ¶ 10(c).

This refers to an alleged agreement not to offer "FAD-free" brands.  But Mr. Lischewski and

others rightly resisted "FAD-free" branding as misleading.  *See, e.g.*, BBDOJ-000882113–116.[1]

Labels touting the purported environmental merits of "FAD-free" tuna are not supported

---

[1] BBDOJ-000882113–116 is a February 2012 "Frequently Asked Questions" document
discussing FAD fishing, and is attached as Exhibit A to the accompanying Declaration of
Nicholas S. Goldberg.

by science, but are primarily driven, instead, by pressure from Greenpeace, which has taken an extreme anti-FAD position that is "inconsistent with broader, ongoing efforts to improve the sustainability of all tuna fisheries and gear types." BBDOJ-000882113. Given that FAD fishing accounts for nearly half the world's skipjack tuna (the predominant canning species), it is more realistic—and, indeed, more sustainable—to improve FAD fishing than try to eliminate it. Yet Greenpeace would rather eliminate FADs because Greenpeace has no incentive to adopt realistic, procompetitive positions. Greenpeace asserts that tuna caught on "free-schools" is more "responsible," "sustainable," and "eco-friendly," implying that FAD fishing is unsustainable. *Id.* But that is false. *Id.* In fact, "all global skipjack stocks are healthy," *id.*, and the tuna industry should not succumb to pressure from Greenpeace to misleadingly imply otherwise. "The bottom line is that Greenpeace is a fund-raising organization and scare tactics and sensationalism are more successful in raising funds than utilizing a science based approach." *Id.*

As of February 2012, moreover, there was "no verified source of 'free-school' skipjack that [was] available to the market." BBDOJ-000882114. "Almost all purse seiners will fish on both schools and FADs during any given fishing trip with school fishing being opportunistic, and fishing on FADs providing more consistent and efficient catches. Forcing a seiner to do one or the other method exclusively would drive efficiency down and cost up," and implementing a system for verifying that tuna is truly "FAD-free"—*i.e.*, not commingled with any FAD-caught tuna—would "require significant operational changes by fishing vessels and tuna processors," including having "capable, independent, on-board observers that are qualified to accurately monitor fishing activity and fish segregation practices." *Id.*

In 2012, Bumble Bee estimated that the cost of verified FAD-free tuna would be 25% more than mixed FAD and school catches, and could easily rise higher than that. *See* BBDOJ-000882115. Yet independent research shows that "only a small percentage of mainstream consumers are willing to pay more for canned tuna from the same region, with the same nutritional benefit, caught via the same gear (purse seine) with the only difference being the manner in which fish are located by the vessel." *Id.* Although many consumers prefer "environmentally friendly" products in principle, "the reality is that there is significant dissonance

between their intentions and actions at shelf when faced with a higher cost." *Id.* And consumers would be right to question "the merits of paying even a small premium for the same product with the same nutritional value and benefits – especially when there is no significant environmental impact" of FAD fishing, despite Greenpeace's attempts to demonize it. *Id.*

Greenpeace's primary reason for advocating school fishing over FAD fishing is that the latter has higher rates of bycatch—the incidental capture of non-target species such as small tunas, pelagic bony fishes, sharks and rays. *See id.*; *see also* Martin Hall & Marlon Roman, *Bycatch and Non-Tuna Catch in the Tropical Purse Seine Fisheries of the World*, FOOD AND AGRICULTURE ORGANIZATION OF THE UNITED NATIONS, FISHERIES AND AGRICULTURE TECHNICAL PAPER NO. 568 at iv (2013). But the significance of the slightly higher bycatch rates for FAD fishing is vastly overstated by brands and labels asserting that school fishing is more "responsible, eco-friendly or sustainable." BBDOJ-000882115. Other than a few species of sharks, FAD bycatch is of species that are not at risk;[2] ISSF is developing new net designs and other technologies to reduce the mortality of at-risk species; the FAD bycatch rates are already low; and bycatch is increasingly being retained for food and other uses. BBDOJ-000882116. In the Western Pacific, where the majority of the world's tuna and all of the skipjack sold by Bumble Bee in the United States are caught, the bycatch rates for school fishing and FAD fishing are just 0.3% and 1.7% respectively—both of which are extremely low:

Purse Seine Bycatch in the Western Pacific – Non-target species (ISSF 2011)

|  | Western Pacific |
|---|---|
| School Fishing (No FAD) | 0.3% |
| FAD | 1.7% |

Moreover, assertions that school fishing is more "eco-friendly" than FAD fishing fail to account for the fact that school fishing requires more fossil fuel. "Because school fishing involves sailing around physically searching for fish, and generally using helicopters to help

---

[2] The incidental bycatch of sharks is not unique to FAD fishing and occurs with other fishing methods in the tuna industry. *See, e.g.*, Victor Restrepo, Juan Pedro Monteagudo & Ana Justel-Rubio, *Recommended Best Practices for Tuna Longline Fisheries in Transition to MSC Certification*, ISSF Technical Report No. 2018-22 at 7–8 (Nov. 2018) (noting that "[t]here are many non-target species caught incidentally in longline fisheries," including "some sharks.").

locate schools, this method can result in the use of more fuel (with a higher associated carbon footprint) than when fishing on FADs that can be marked with beacons for easy locating." *Id.* In sum, there are "pros and cons to each method of fishing and scientists believe both FAD and School fishing methods have a role to play in tuna fishing." *Id.* Brands and labels that imply otherwise are misleading and anticompetitive. BBDOJ-000882113–116.

In any event, whatever one thinks of the foregoing arguments, it is not unlawful, *per se* or otherwise, to assert them and convince others of their merit. On the contrary, Mr. Lischewski's advocacy against what he believed to be Greenpeace's unscientific "scare tactics and sensationalism" is protected by the First Amendment. Yet the Government contends that by successfully advocating these positions on behalf of Bumble Bee and ISSF, Mr. Lischewski committed a *per se* violation of Section 1 of the Sherman Act. *See* Indictment ¶ 10(c).[3] The Government is wrong.

### III.    ARGUMENT

Federal Rule of Criminal Procedure 12(b) allows a defendant to raise by pretrial motion any defense, objection, or request that the court can "determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Such a motion "is generally capable of determination before trial if it involves questions of law rather than fact." *United States v. Kelly*, 874 F.3d 1037, 1046 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 2038 (2018) (quoting *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993), *aff'd*, 87 F.3d 1324 (9th Cir. 1996) (unpublished)). The court may make "preliminary findings of fact necessary to decide the legal questions presented by the motion," but may not "invade the province of the ultimate finder of fact." *Nukida*, 8 F.3d at 669. Here, Mr. Lischewski's "challenges to the indictment are based on legal issues" that the Court may resolve "without intruding upon the province of the ultimate finder of fact." *Kelly*, 874 F.3d at 1046–47 (internal quotation marks omitted).

---

[3] The indictment does not expressly use the term "*per se*," but the Government only criminally prosecutes "horizontal, *per se* unlawful agreements," whereas "civil prosecution is used with respect to other suspected antitrust violations, including those that require analysis under the rule of reason." U.S. Dep't of Justice Antitrust Division Manual at III-12 (5th Ed. 2018).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### A.    The caution Mr. Lischewski advocated with regard to environmental claims on tuna labels was not unlawful but, much to the contrary, mandated by law.

Section 5 of the Federal Trade Commission (FTC) Act states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."  15 U.S.C. § 45(a)(1).  The FTC has set forth guidelines regarding "environmental claims," 16 C.F.R. § 260.1, such as labeling a product "environmentally preferable," 16 C.F.R. § 260.3(d), or "Eco-friendly," 16 C.F.R. § 260.4(d).  Brands and labels that make such claims, expressly or by implication, must be "supported by a reasonable basis," which "often requires competent and reliable scientific evidence" consisting of "tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results," and "should be sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that each of the marketing claims is true."  16 C.F.R. § 260.2.  "An environmental marketing claim should not overstate, directly or by implication, an environmental attribute or benefit.  Marketers should not state or imply environmental benefits if the benefits are negligible."  *Id.* § 260.3(c).  Nor should labels make unsubstantiated comparisons.  *Id.* § 260.3(d).  For example, labeling a product "environmentally preferable" implies that it is environmentally superior to other products; unless that claim is substantiated, the label is deceptive.  *Id.*  Likewise, an "Eco-friendly" brand or label "likely conveys that the product has far-reaching environmental benefits and may convey that the product has no negative environmental impact," which is deceptive if unsubstantiated.  *Id.* § 260.4(d).

As set forth above, Mr. Lischewski, on behalf of Bumble Bee and ISSF, took the position that brands and labels expressly stating or implying that skipjack caught on "free schools" is more "responsible, sustainable or eco-friendly" imply, in turn, that other methods of skipjack fishing are not sustainable.  But that is false.  "Scientific evidence proves that this is NOT the case as all global skipjack stocks are healthy."  BBDOJ-000882113.  In other words, the claims implied by "FAD-free" labels are not substantiated by "competent and reliable scientific evidence," as the FTC requires.  *See* 16 C.F.R. § 260.2.  Indeed, aside from any direct or implied negative claims

6

1320671

1  about the sustainability of FAD fishing, even the claim that canned tuna is "FAD-free" is—or, at

2  least, was—dubious because, as of February 2012, there was no verified source of "free-school"

3  tuna on the market.  BBDOJ-000882114.  Further, labels touting "FAD-free" tuna as more "eco-

4  friendly," "sustainable," or "responsible" violate the prohibition against labels that "overstate,

5  directly or by implication, an environmental attribute or benefit," especially benefits that are

6  "negligible."  16 C.F.R. § 260.3(c); *see* BBDOJ-000882115–116.  Moreover, because using

7  FADs reduces the use of fossil fuels, *see* BBDOJ-000882116, trumpeting the purported

8  environmental benefits of "FAD-free" fishing, without disclosing its larger carbon footprint,

9  contravenes the principle that an environmental label must not "convey that the product has no

10  negative environmental impact," when that claim is untrue or unsubstantiated.  *See* 16 C.F.R. §

11  260.4(d).

12      It cannot be unlawful or anticompetitive to follow, and advocate that others follow, FTC

13  guidelines that are designed to promote fair competition.  *See* 15 U.S.C. § 45; 16 C.F.R. § 260.1

14  *et seq.*  Yet that is what Mr. Lischewski did in resisting the segmentation of the tuna market by

15  means of brands and labels that "overstate, directly or by implication," the purported

16  "environmental attribute[s] or benefit[s]" of FAD-free fishing.  *See* 16 C.F.R. § 260.3.  As Mr.

17  Lischewski, Bumble Bee and ISSF explained, moreover, they projected that verifiably "FAD-

18  free" tuna would cost consumers at least 25% more, for purported environmental benefits that, if

19  they exist at all, are negligible by comparison to such a high premium.  *See* BBDOJ-000882115.

20  Trying to avoid price increases that are driven, not by consumer demand, nor quality

21  improvements, nor well-substantiated environmental benefits, but instead by Greenpeace "scare

22  tactics and sensationalism," BBDOJ-000882113, is procompetitive, not anticompetitive.  In any

23  event, it is not unlawful, much less unlawful *per se*.  On the contrary, such advocacy is protected

24  by the First Amendment and thus cannot be criminalized.  *See* U.S. Const. amend. I.

25      **B.    Even if the alleged agreement about "FAD free" tuna might be unlawful, it
              cannot be unlawful *per se*, but must be evaluated under the rule of reason.**

26

27      Even if the alleged agreement about "FAD-free" tuna might be unlawful—which it cannot

28  be, as shown above—it is subject to the rule of reason.  The Sherman Act prohibits agreements

"in restraint of trade," 15 U.S.C. § 1, but the Supreme Court "has long recognized that Congress

7

1320671

1    intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

2    Most antitrust claims, therefore, are analyzed under the "rule of reason," which requires the jury

3    to "decide whether the questioned practice imposes an unreasonable restraint on competition,

4    taking into account a variety of factors, including specific information about the relevant

5    business, its condition before and after the restraint was imposed, and the restraint's history,

6    nature, and effect." *Id.*  Sometimes the rule of reason may be satisfied with a "quick look," but

7    only when "an observer with even a rudimentary understanding of economics could conclude that

8    the arrangements in question would have an anticompetitive effect on customers and markets."

9    *Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999).  And it is even harder to justify *per se*

10   liability, which is only proper for the dwindling category of restraints that have "manifestly

11   anticompetitive" effects and lack "any redeeming virtue."  *Leegin Creative Leather Prods., Inc. v.*

12   *PSKS, Inc.*, 551 U.S. 877, 886 (2007).  Thus, the Supreme Court has refused to adopt new *per se*

13   rules, and has repeatedly overturned old ones, where the alleged restraint might have some

14   procompetitive value.  *See*, *e.g.*, *id.* at 900; *State Oil*, 522 U.S. at 20–22.

15          Indeed, in *California Dental*, the Supreme Court held that more than a "quick look"—and

16   thus, *a fortiori*, more than a mere assumption of *per se* illegality—is required where, as here, the

17   defendant arguably sought to protect consumers from "misleading or irrelevant advertising."  526

18   U.S. at 773.  In *California Dental*, the FTC alleged that the advertising guidelines of the

19   California Dental Association (CDA) unreasonably restricted advertising about discounts and

20   about the quality of dental services.  *See id.* at 759–62.  The FTC treated the restrictions on

21   discount advertising as illegal *per se*, and also held, in the alternative, that those restrictions, as

22   well as the restrictions on quality advertising, were illegal under a "quick look" rule-of-reason

23   analysis.  *See id.* at 762–63.  The Ninth Circuit held that *per se* liability was inappropriate, but

24   affirmed the "quick look" analysis.  *Id.*  The Supreme Court reversed, holding that a full rule-of-

25   reason analysis was required.  *See id.* at 769–81.

26          Even the restrictions on discount advertising were, "at least on their face, designed to

27   avoid false or deceptive advertising," which "has an anticompetitive effect."  *Id.* at 771 & n.9.

28   And the Ninth Circuit was wrong to assume that restrictions on quality advertising are "in effect a

8

1320671

form of output limitation." *Id.* at 776.  That notion is "puzzling, given that the relevant output for antitrust purposes here is presumably not information or advertising, but dental services themselves.  The question is not whether the universe of possible advertisements has been limited (as assuredly it has), but whether the limitation on advertisements obviously tends to limit the total delivery of dental services." *Id.*  Even if quality advertising might induce "some patients to obtain more care than they would in its absence, then restricting such advertising would reduce the demand for dental services, not the supply; and it is of course the producers' supply of a good in relation to demand that is normally relevant in determining whether a producer-imposed output limitation has the anticompetitive effect of artificially raising prices." *Id.* at 776–77.  Restrictions on quality advertising might have such an effect, but it cannot be assumed, *see id.* at 777 n.13, particularly given CDA's plausible "suggestion that restricting difficult-to-verify claims about quality or patient comfort would have a procompetitive effect by preventing misleading or false claims that distort the market.  It is, indeed, entirely possible to understand the CDA's restrictions on unverifiable quality and comfort advertising as nothing more than a procompetitive ban on puffery." *Id.* at 777–78.

In any event, the dispositive point was not that the advertising restrictions were necessarily procompetitive, but that "the plausibility of competing claims about the effects of the professional advertising restrictions rules out the indulgently abbreviated review to which the Commission's order was treated.  The obvious anticompetitive effect that triggers abbreviated analysis has not been shown." *Id.* at 778; *see also Cal. Dental Ass'n v. F.T.C.*, 224 F.3d 942 (9th Cir. 2000) (ordering dismissal after conducting the rule-of-reason analysis mandated by the Supreme Court); *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003) ("When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, *per se* treatment is inappropriate, and the rule of reason applies."); *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 776 (8th Cir. 2004) (because advertising restrictions in the limousine industry were arguably procompetitive, "abbreviated *per se* analysis was inappropriate"); *Nat'l Ass'n of Review Appraisers & Mortg. Underwriters, Inc. v. Appraisal Found.*, 64 F.3d 1130, 1133 (8th Cir. 1995) ("Organizations are

9

free to associate, share information, and engage in self-regulation.  Accordingly, in the absence of any showing that the challenged practices are anticompetitive on their face, we will apply the rule of reason to determine if there is an antitrust violation.").

Here, even if the alleged agreement regarding "FAD-free" tuna might be unlawful—which it is not, as discussed above—it cannot be unlawful *per se*.  Mr. Lischewski and others had lawful, procompetitive reasons for resisting pressure from Greenpeace to artificially segment the market into "FAD" and "FAD-free" tuna, with the latter misleadingly touted as more "responsible, sustainable or eco-friendly."  BBDOJ-000882113.  As already discussed, the FTC mandates exactly the same caution Mr. Lischewski, Bumble Bee, ISSF and others urged about such environmental claims.  *See* 15 U.S.C. § 45; 16 C.F.R. § 260.1 *et seq*.  Because resistance to arguably misleading "FAD-free" branding has procompetitive value, it cannot be unlawful *per se*. *See id.*; *California Dental*, 526 U.S. at 771–78.

Moreover, whether or not "FAD-free" branding is misleading, refusing to adopt it is not "manifestly anticompetitive."  *Leegin*, 551 U.S. at 886.  On the contrary, segmenting the market in that way would result in higher prices for tuna for little or no good reason.  BBDOJ-000882115–116.  Resisting artificial price increases is procompetitive, not anticompetitive.  And, to the extent the Government contends that refusing to adopt "FAD-free" labels restricted output,[4] that theory is foreclosed by *California Dental*.  The "relevant output for antitrust purposes" here is tuna, not "FAD-free" labels, and the question is whether the limitation on such branding "obviously tends to limit the total delivery of" tuna.  526 U.S. at 776.  The answer is clear: *No*.  On the contrary, the total amount of tuna on the market will be reduced, with a corresponding increase in prices, if the tuna industry succumbs to pressure from Greenpeace to eliminate or substantially reduce FAD fishing.  *See* BBDOJ-000882115–116.  Whatever one may think about Greenpeace's antipathy to FADs from an environmental or political perspective—and the potential salience of those perspectives underscores the First Amendment concerns raised by the

---

[4] *Cf. In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670 JLS (MDD), 2017 WL 35571, at *11 (S.D. Cal. Jan. 3, 2017) (characterizing refusal to offer "FAD-free" brands as output restriction in the context of motion to dismiss civil case, but failing to consider *California Dental* and the procompetitive reasons for refusing to offer brands with misleading labels).

1320671

1    Government's allegations—resisting the demonization of FAD fishing to maintain higher

2    quantities of tuna on the market, at lower prices, is at least arguably procompetitive, not

3    "manifestly anticompetitive."  *Leegin*, 551 U.S. at 886.

4         Furthermore, the industry position the Government complains about is the one advocated

5    by ISSF, which is a "standards development organization."  15 U.S.C. § 4301(a)(8).  Congress

6    has explicitly decreed that the conduct of such organizations "***shall not be deemed illegal per se***;

7    such conduct shall be judged on the basis of its reasonableness, taking into account all relevant

8    factors affecting competition, including, but not limited to, effects on competition in properly

9    defined, relevant research, development, product, process, and service markets."  15 U.S.C. §

10   4302 (emphasis added); *see also* Hajin Kim, *Eco-Labels and Competition: Eco-Certification*

11   *Effects on the Market for Environmental Quality Provision*, 22 N.Y.U. ENVTL. L.J. 181, 187

12   (2015) (Section 4302, and thus the rule of reason, applies to the standardization of "eco-labels").

13        Although the Government may argue that 15 U.S.C. § 4302 does not apply because the

14   claims against Mr. Lischewski are not limited to his standards development activity as Chair of

15   ISSF, section 4302 is relevant regardless because it codifies the general principle that

16   standardization efforts—by individuals and companies as well as standards development

17   organizations—are "ordinarily evaluated under the rule of reason."  *Craftsmen Limousine*, 363

18   F.3d at 774 (quoting Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 2232b (1998)).

19   In particular, efforts to standardize "eco-labels" are subject to the rule of reason because they may

20   have the procompetitive benefit of avoiding artificial market segmentation based "on a metric that

21   does not matter or that might even harm the environment by signaling that the metric matters

22   (consumers might assume that the label's presence indicates relevance).  This can be detrimental

23   to welfare."  Kim, *supra*, at 185 n.11.  For example, consumers may be unaware that fishing

24   methods described as "dolphin-safe" may actually "increase the bycatch of many other species."

25   *Id.* (citing Martin Hall, *An Ecological View of the Tuna-Dolphin Problem: Impacts and Trade-*

26   *Offs*, 8 REVS. FISH BIOLOGY & FISHERIES 1, 25 (1998)).  Similarly, as already discussed, although

27   the bycatch rates for FAD fishing are higher than for FAD-free fishing, "80-95 percent of the by-

28   catch is of species that are not at risk"; the marginally lower bycatch rates for FAD-free fishing

are offset by "the use of more fuel (with a higher associated carbon footprint)"; and improvements in technology can reduce FAD-related bycatch even further, whereas eliminating FADs is unrealistic and would cause massive price increases.  BBDOJ-000882115–116.

Thus, even assuming that the alleged agreement about "FAD-free" tuna might be unlawful, it cannot be unlawful *per se*, and must be evaluated (if at all) under the rule of reason.

### C.   Because the indictment alleges a single conspiracy comprising an agreement that is not unlawful, much less unlawful *per se*, the case should be dismissed.

The Government will presumably argue that it alleged a price-fixing conspiracy, which is unlawful *per se*.  But the Government chose to allege price fixing and the purported agreement about FAD-free tuna in a single count.  That count should be dismissed for duplicity—improper joinder of two or more distinct offenses in a single count.  *See United States v. Aguilar*, 756 F.2d 1418, 1420 n.2 (9th Cir. 1985).  "The vices of duplicity arise from breaches of the defendant's Sixth Amendment right to knowledge of the charges against him, since conviction on a duplicitous count could be obtained without a unanimous verdict as to each of the offenses contained in the count."  *Id.*  A duplicitous indictment, moreover, "could eviscerate the defendant's Fifth Amendment protection against double jeopardy, because of a lack of clarity concerning the offense for which he is charged or convicted."  *Id.*  "The test for determining whether a single count improperly contains multiple, distinct offenses is 'whether identical evidence will support each of them, and if any dissimilar facts must be proved, there is more than one offense.'"  *United States v. Bonds*, No. C 07-732 SI, 2008 WL 618911, at *1 (N.D. Cal. Mar. 4, 2008) (quoting *United States v. Holley*, 942 F.2d 916, 928 (5th Cir. 1991)).

For example, in *United States v. Bonnar*, No. CR08-197Z, 2008 WL 4460267 (W.D. Wash. Oct. 1, 2008), a single count alleged multiple false statements, each of which would "require different evidence at trial."  *Id.* at *2.  The court held that the defendant was "entitled to have his duplicity claim cured in a timely manner before trial.  The Government's suggestion that the issue can be cured at trial with a proper jury instruction is rejected."  *Id.* at *3 (citing *Bonds*, 2008 WL 618911).  The court concluded that the offending count "must be dismissed unless the Government elects to proceed on one false statement in [that count] or otherwise chooses to supersede the indictment."  *Id.*

12

1320671

Here, as demonstrated above, to the extent the purported agreement about FAD-free tuna might be unlawful, it cannot be unlawful *per se*, and must be subject to the rule of reason.  It will require different evidence at trial from the Government's claim that Mr. Lischewski participated in an illegal price-fixing conspiracy.  *See*, *e.g.*, *State Oil*, 522 U.S. at 10 (under the rule of reason, as opposed to a *per se* analysis, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect").  Because these two aspects of the purported conspiracy the Government chose to allege in a single count will "require different evidence at trial," the sole count of the indictment should be dismissed.  *See Bonnar*, 2008 WL 4460267, at *2–3.

> **D.** **If the Court allows the Government to separate its duplicitous charges, the charge relating to "FAD-free" tuna must be dismissed because the alleged agreement is not unlawful, and because that charge is time-barred.**

The Government might seek to separate its price-fixing allegations from its allegations relating to "FAD-free" tuna.  *See*, *e.g.*, *Bonds*, 2008 WL 618911, at *2; *Bonnar*, 2008 WL 4460267, at *3.  But if it does, any distinct charge relating to "FAD-free" tuna must be dismissed.  As discussed above, it was not unlawful for Mr. Lischewski, Bumble Bee, ISSF and others to resist the segmentation of the tuna market by means of brands and labels that "overstate, directly or by implication," the purported "environmental attribute[s] or benefit[s]" of FAD-free fishing.  *See* 16 C.F.R. § 260.3.  Moreover, "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."  18 U.S.C. § 3282(a).  The alleged agreement not to sell "FAD-free" branded tuna occurred in 2012.  Thus, any charge based on that alleged agreement is time-barred and must be dismissed for this additional reason.

> **E.** **At the very least, the Court should hold that the Government's allegations relating to "FAD-free" tuna are subject to the rule of reason.**

Finally, the Court should ***at least*** issue an order making clear that, if the Court allows the Government to pursue its allegations regarding "FAD-free" tuna—which the Court should not allow, for the reasons discussed above—the rule of reason will apply.  In *United States v. Kemp*

1 & *Assocs., Inc.*, 907 F.3d 1264 (10th Cir. 2018), for example, the defendants moved to dismiss

2 the indictment, or for an order that the case "would proceed pursuant to the rule of reason, as

3 opposed to the *per se* rule." *Id.* at 1269.  It is particularly important and efficient to resolve that

4 issue well before trial, given the Government's "institutional decree" that it will not prosecute

5 criminal antitrust cases under the rule of reason.  *See id.* at 1274 (citing U.S. Dep't of Justice

6 Antitrust Division Manual at III-12 (5th Ed. 2018)).  Here, an order that the case will proceed

7 under the rule of reason, at least with regard to any remaining claim relating to "FAD-free" tuna,

8 will not only resolve an important issue the Court can and should determine before "trial on the

9 merits," Fed. R. Crim. P. 12(b)(1), but may—and should—result in at least a partial dismissal

10 based on the Government's own "institutional decree." *Kemp*, 907 F.3d at 1274.

## IV.    CONCLUSION

12      For the foregoing reasons, the Court should dismiss the indictment in its entirety, or, at the

13 very least, hold that the Government's allegations relating to "FAD-free" tuna are subject to the

14 rule of reason.

Respectfully submitted,

Dated:  March 6, 2019                      KEKER, VAN NEST & PETERS LLP


By:    */s/ Elliot P. Peters*
       JOHN W. KEKER
       ELLIOT R. PETERS
       ELIZABETH K. MCCLOSKEY
       NICHOLAS S. GOLDBERG

       Attorneys for Defendant
       CHRISTOPHER LISCHEWSKI

MOTION TO DISMISS OR FOR AN ORDER THAT THE RULE OF REASON APPLIES
Case No. 3:18-cr-00203-EMC

1320671