MICAH L. RUBBO (CSBN 267465)
LESLIE A. WULFF (CSBN 277979)
MIKAL J. CONDON (CSBN 229208)
ANDREW SCHUPANITZ (CSBN 315850)
U.S. Department of Justice, Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 934-5300
Mikal.Condon@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER LISCHEWSKI,<br><br>              Defendant. | No. 18-cr-00203-EMC<br><br>**TRIAL BRIEF OF THE UNITED STATES**<br><br>Pretrial Conf.: August 27, 2019, 10:30 a.m.<br>Jury Selection: October 25, 2019<br>Trial: November 4, 2019<br>Judge: Hon. Edward M. Chen<br>Courtroom: 5, 17th Floor |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     DESCRIPTION OF THE OFFENSE .................................................................. 1

III.    STATEMENT OF FACTS ................................................................................... 1

        A.      The Price-Fixing Conspiracy ................................................................ 1

        B.      Enforcement of the Conspiracy ............................................................ 3

        C.      Defendant's Role in the Conspiracy ..................................................... 3

IV.     STIPULATED FACTS ......................................................................................... 4

V.      LAW APPLICABLE TO SHERMAN ACT OFFENSES .................................. 4

        A.      Elements ................................................................................................ 4

        B.      Price Fixing Is a *Per Se* Violation of the Sherman Act .................... 5

        C.      The Sherman Act Is a General Intent Statute and the Agreement Is the Crime ..... 6

        D.      The Agreement Need Not Be Explicit or Formal ................................. 7

        E.      A Single Conspiracy May Include Sub-Agreements ............................ 7

        F.      Ignorance of the Law Is No Defense .................................................... 8

        G.      Not All Charged Means and Methods Must Be Proved ....................... 8

        H.      Interstate Commerce ............................................................................. 8

VI.     SCOPE OF TESTIMONY ................................................................................... 9

        A.      Defendant's Expert Witness Disclosure Is Deficient ........................... 9

        B.      Coconspirators May Testify about the Existence of an Agreement ..... 10

        C.      Circumstantial Evidence May Be Used to Prove a Sherman Act Conspiracy ..... 12

        D.      A Witness's General Recollection Is Probative Evidence ................... 13

        E.      Background Evidence of Pre-Conspiracy Activity by Coconspirators Is
                Admissible ............................................................................................ 14

        F.      Character Evidence Is Only Allowed for Limited Reasons .................. 15

                1.      Defendant's Character .............................................................. 15

                2.      Character Evidence Regarding Testifying Witnesses ............... 16

      G.     Evidence Regarding the Environmental Impact of Fishing Methods Is Not Relevant ............................................................................................... 18

      H.     Use of a Summary Agent Is Permissible ............................................. 19

VII.    EVIDENTIARY ISSUES RELATED TO WITNESSES.................................................. 20

      A.     Prior Consistent Statements Are Admissible to Rehabilitate a Witness After Impeachment or to Rebut the Implication of Fabrication of Testimony ............. 20

      B.     Out-of-Court Assertions Are Admissible Not for the Truth................................. 21

      C.     Defendant's Hearsay Statements Are Inadmissible ............................................... 22

VIII.   EVIDENTIARY ISSUES RELATED TO DOCUMENTS............................................ 23

      A.     Emails Can Be Admissible Under the Business Record Exception .................... 23

      B.     Calendar Entries Are Not Hearsay....................................................................... 24

      C.     Email Strings Can Be Admissible in Their Entirety for Context.......................... 25

IX.     RECIPROCAL DISCOVERY OF DEFENSE SUBPOENAED DOCUMENTS............ 26

X.      CONCLUSION........................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Tobacco Co. v. United States*, 328 U.S. 781 (1946)..........................................................7

*American Tobacco Co. v. United States*, 147 F.2d 93 (1944) ......................................................6

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) ........................................................5

*Chavez v. United States*, 275 F.2d 813 (9th Cir. 1960) ............................................................6

*Clark v. City of Los* Angeles, 650 F.2d 1033 (9th Cir. 1981)...................................................24

*Cooper v. United States*, 91 F.2d 195 (5th Cir. 1937) ..............................................................8

*Esco Corp. v. United States*, 340 F.2d 1000 (9th Cir. 1965) ....................................................7

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2000)...................................5

*Gaines v. Walker*, 986 F.2d 1438 (D.C. Cir. 1993) .................................................................20

*Ionian Corp. v. Country Mut. Ins. Co.*, 836 F. Supp. 2d 1173 (D. Or. 2011)............................24

*Michelson v. United* States, 335 U.S. 469 (1948)..................................................................16

*Misle Bus & Equip. Co.*, 967 F.2d ......................................................................................12

*Monotype Corp. PLC v. Int'l Typeface Corp.*, 43 F.3d 443 (9th Cir. 1994)...............................24

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1 (1958)................................................................5

*Nash v. United States*, 229 U.S. 373 (1913) ..........................................................................6

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85 (1984).......................................5

*Nye & Nissen v. United States*, 168 F.2d 846 (9th Cir. 1948) ..................................................12

*Nye & Nissen v. United States,* 336 U.S. 613 (1949)..............................................................12

*Pittsburgh Plate Glass Co. v. United States*, 260 F.2d 397 (4th Cir. 1958) .................................8

*Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395 (1959) .............................................8

*Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128 (9th Cir. 1960) ....................6

*Schino v. United States*, 209 F.2d 67 (9th Cir. 1953) .............................................................12

*Sea-Land Serv., Inc. v. Lozen Intern., LLC*, 285 F.3d 808 (9th Cir. 2002)................................23

*Tripp v. United States*, 381 F.2d 320 (9th Cir. 1967) .............................................................14

*United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992).........................................................5, 6

*United States v. Arbelaez*, 719 F.2d 1453 (9th Cir. 1983) ............................................................. 7

*United States v. Armco Steel Corp.*, 252 F. Supp. 364 (S.D. Cal. 1966) ...................................... 7

*United States v. Barry*, 814 F.2d 1400 (9th Cir. 1987) .................................................................. 15

*United States v. Baskes*, 649 F.2d 471 (7th Cir. 1980) .................................................................. 12

*United States v. Beltran*, 165 F.3d 1266 (9th Cir. 1999) ............................................................... 20

*United States v. Bonnano*, 467 F.2d 17 (9th Cir. 1972) ................................................................ 12

*United States v. Brooke*, 4 F.3d 1480 (9th Cir. 1993) ................................................................... 17

*United States v. Brown*, 936 F.2d 1042 (9th Cir. 1991) .............................................................. 5, 7

*United States v. Bump*, 605 F.2d 548 (10th Cir. 1979) ................................................................ 26

*United States v. Calaway*, 524 F.2d 609 (9th Cir. 1975) .............................................................. 22

*United States v. Cargo Serv. Stations Inc.*, 657 F.2d 676 (5th Cir. 1981) .................................... 11

*United States v. Casoni*, 950 F.2d 893 (3d Cir. 1991) .................................................................. 20

*United States v. Collicott*, 92 F.3d 973 (9th Cir. 1996) ................................................................ 20

*United States v. Connelly*, 395 F. App'x 407 (9th Cir. 2010) ....................................................... 22

*United States v. Cont'l Group, Inc.*, 456 F. Supp. 704 (E.D. Pa. 1978) ....................................... 15

*United States v. Crook*, 479 Fed. Appx. 568 (5th Cir. 2012) ....................................................... 26

*United States v. Dansker*, 537 F.2d 40 (3d Cir. 1976) ................................................................. 13

*United States v. DeGeorge*, 380 F.3d 1203 (9th Cir 2004) ......................................................... 15

*United States v. Diaz*, 597 F.3d 56 (1st Cir. 2010) ...................................................................... 22

*United States v. Dunham Concrete Prods. Inc.*, 475 F.2d 1241 (5th Cir. 1973) .......................... 15

*United States v. Enright*, 579 F.2d 980 (6th Cir. 1978) ................................................................ 14

*United States v. Eppolito*, 646 F. Supp. 2d 1239 (D. Nev. 2009) ................................................. 26

*United States v. Evans*, 484 F.2d 1178 (2d Cir. 1973) ................................................................. 14

*United States v. Gajo*, 290 F.3d 922 (7th Cir. 2002) .................................................................... 26

*United States v. Giese*, 597 F.2d 1170 (9th Cir. 1979) ................................................................ 16

*United States v. Giordano*, 261 F.3d 1134, (11th Cir. 2001) ......................................................... 8

*United States v. Gouveia*, 468 Fed. Appx. 793 (9th Cir. 2012) .................................................... 26

*United States v. Grande*, 620 F.2d 1026 (4th Cir. 1980) .............................................................. 12

1  *United States v. Hamilton,* 413 F.3d 1138 (10th Cir. 2005) ............................ 25

2  *United States v. Harris*, 491 F.3d 440 (D.C. Cir. 2007) .............................. 16

3  *United States v. Herzberg*, 558 F.2d 1219 (5th Cir. 1977) ........................... 17

4  *United States v. Hewitt,* 634 F.2d 277 (5th Cir. 1981) ............................... 16

5  *United States v. Hicks*, 848 F.2d 1 (1st Cir. 1988) .................................. 22

6  *United States v. Holt*, 486 F.3d 997 (7th Cir. 2007) ................................ 17

7  *United States v. Ibarguen-Mosquera*, 634 F.3d 1370 (11th Cir. 2011) ................ 10

8  *United States v. Jones*, 425 F.2d 1048 (9th Cir. 1970) .............................. 14

9  *United States v. Joyce*, 895 F.3d 673 (9th Cir. 2018) ................................ 5

10 *United States v. Kartman*, 417 F.2d 893 (9th Cir. 1969) .............................. 8

11 *United States v. Khorozian*, 333 F.3d 498 (3d Cir. 2003) ............................ 25

12 *United States v. Lebron-Gonzalez*, 816 F.2d 823 (1st Cir. 1987) ..................... 23

13 *United States v. Lim*, 984 F.2d 331 (9th Cir. 1993) ................................. 21

14 *United States v. Lin*, 101 F.3d 760 (D.C. Cir. 1996) ................................ 17

15 *United States v. Lopez*, 803 F.2d 969 (9th Cir. 1986) ............................... 21

16 *United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) ................................. 23

17 *United States v. Metro. Enters. Inc.*, 728 F.2d 444 (10th Cir. 1984) ................ 11

18 *United States v. Miller*, 771 F.2d 1219 (9th Cir. 1985) ..................... 6, 22, 23

19 *United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227 (8th Cir. 1992) ............ 10

20 *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007) ............................ 23

21 *United States v. MMR Corp. (LA)*, 907 F.2d 489 (5th Cir. 1990) .................. 7, 10

22 *United States v. Moon*, 512 F.3d 359 (7th Cir. 2008) ................................ 25

23 *United States v. Murray*, 492 F.2d 178 (9th Cir. 1973) .............................. 12

24 *United States v. New York Great Atlantic & Pacific Tea Co.,* 137 F.2d 459 (5th Cir. 1943) ...... 11

25 *United States v. Olivo*, 80 F.3d 1466 (10th Cir. 1996) .............................. 17

26 *United States v. ORS, Inc.*, 997 F.2d 628 (9th Cir. 1993) ............................ 8

27 *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000) .............................. 23

28 *United States v. Owens*, 484 U.S. 554 (1988) ....................................... 13

1   *United States v. Owens*, 789 F.2d 750 (9th Cir. 1986) .................................................... 13

2   *United States v. Palow*, 777 F.2d 52 (1st Cir. 1985) ...................................................... 23

3   *United States v. Patterson*, 819 F.2d 1495 (9th Cir. 1987)................................................ 8

4   *United States v. Pazsint*, 703 F.2d 420 (9th Cir. 1983) ................................................. 24

5   *United States v. Pierre*, 781 F.2d 329 (2d Cir. 1986) ..................................................... 21

6   *United States v. Rosa*, 891 F.2d 1063 (3d Cir. 1989) ..................................................... 17

7   *United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999) .................................................... 26

8   *United States v. Schwab*, 886 F.2d 509 (2d Cir. 1989)................................................... 18

9   *United States v. Sims*, 617 F.2d 1371 (9th Cir. 1980).................................................... 21

10  *United States v. Singleterry*, 29 F.3d 733 (1st Cir. 1994).............................................. 23

11  *United States v. Smith Grading and Paving, Inc.*, 760 F.2d 527 (4th Cir. 1985) ........................ 11

12  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)............................................ 6, 8

13  *United States v. Stackpole*, 811 F.2d 689 (1st Cir. 1987) ............................................... 26

14  *United States v. Standard Oil Co.*, 316 F.2d 884 (7th Cir. 1963)........................................ 11

15  *United States v. Stover*, 329 F.3d 859 (D.C. Cir. 2003).............................................. 20, 21

16  *United States v. Tolliver*, 454 F.3d 660 (7th Cir. 2006)................................................ 26

17  *United States v. Trenton Potteries Co.*, 273 U.S. 392 (1927)........................................... 6, 8

18  *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969) ................................................. 8

19  *United States v. Washington,* 498 F.3d 225 (4th Cir. 2007) ............................................ 25

20  *United States v. Whitman*, 771 F.2d 1348 (9th Cir. 1985)............................................... 26

21  *United States v. Whitmore*, 359 F.3d 609 (D.C. Cir. 2004) ............................................. 17

22  *United States v. Wolfson*, 634 F.2d 1217 (9th Cir. 1980) ........................................... 21, 22

23  *United States v. Wong*, No. 12-CR-483, 2014 WL 923347 (N.D. Cal. Mar. 5, 2014) ................. 19

24  *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. 08-CV-5129, 2011 WL 4079223 (N.D.

25      Cal. Sept. 12, 2011)................................................................................. 24

26  *Weiss v. United States*, 103 F.2d 759 (3d Cir. 1939).................................................... 8

27  *Wilson v. Muckala*, 303 F.3d 1207 (10th Cir. 2002)..................................................... 17

28  *//*

**Other Authorities**

ABA Section of Antitrust Law, *Model Jury Instructions in Criminal Antitrust Cases* (2009) . 5, 7

**Rules**

Fed. R. Evid. 404(a) ............................................................................................ 15

Fed. R. Evid. 405(a) ............................................................................................ 16

Fed. R. Evid. 608(a) ............................................................................................ 16

Fed. R. Evid. 608(b) ............................................................................................ 17

Fed. R. Evid. 801(c) ............................................................................................ 21

Fed. R. Evid. 801(d) .................................................................................. 20, 22, 23

Fed. R. Evid. 803(6) ............................................................................................ 23

**Treatises**

2 Wigmore, Evidence (3d ed. 1940) ..................................................................... 14

3 Wigmore, Evidence (Chadbourn Rev. 1970) ..................................................... 13

4 Mueller & Kirkpatrick, Federal Evidence (2d ed. 1994) ................................... 25

7 Wigmore, Evidence (Chadbourn Rev. 1978) ..................................................... 13

Graham, Handbook of Federal Evidence (1981) .................................................. 13

McCormick, Evidence (2d ed. 1972) .................................................................... 13

1

## I.   INTRODUCTION

Pursuant to the Court's Pretrial Order for Criminal Jury Trial, the United States respectfully submits this trial brief, which sets forth a description of the charged offense, a summary of the facts, a description of the applicable law, and an overview of the anticipated issues at trial.

## II.   DESCRIPTION OF THE OFFENSE

On May 16, 2018, a federal grand jury returned an indictment charging defendant, then-CEO of Bumble Bee Foods, LLC ("Bumble Bee"), with violating Section 1 of the Sherman Act, 15 U.S.C. § 1.  The single-count indictment charges defendant with participating in a conspiracy to fix the prices of packaged seafood, defined as canned tuna, beginning in or about November 2010 until in or about December 2013.  Defendant was arraigned on the charge on June 6, 2018, and remains out of custody on bail pending trial.

## III.   STATEMENT OF FACTS

A more detailed recitation of the facts of this case can be found in the government's Notice of Coconspirator Statements. (Dkt. No. 133.)  In summary, the relevant facts will show the following:

### A.     The Price-Fixing Conspiracy

The Court has found by a preponderance of evidence that beginning in or about November 2010 and continuing until in or about December 2013, high-level executives from the three U.S.-based packaged-seafood companies—Bumble Bee, Tri-Union Seafoods LLC d/b/a Chicken of the Sea ("COSI"), and StarKist Co. ("StarKist")—engaged in a conspiracy to fix the prices of shelf-stable canned tuna.  The conspirators reached pricing agreements through bilateral phone calls, emails, and in-person meetings, between individuals at each company.

The conspirators agreed on pricing strategy generally.  At the end of 2010, for example, the conspirators agreed to stop an aggressive price war that had been cutting into profits.  The conspirators agreed not to attack each other's core market share and to restrain competition by not pricing aggressively.  This overarching goal prompted sub-agreements on specific pricing

//

actions and a coordinated product ban in response to Greenpeace's attack on the packaged-seafood industry.

The conspiracy encompassed multiple levels of pricing, including list prices (the starting point from which discounts are negotiated by the retailer customer), quarterly pricing guidance (used internally by sales teams to negotiate prices with retailers), and promotional price points for specific retailers and products:

- The packaged-seafood companies coordinated at least three list price increases: one in 2011, and two in 2012. For each list price increase, the conspirators agreed on whether to take a list price increase, the amount of the list price increase, the announcement date of the list price increase, the effective date of the increase, and the rationale the conspirators would give their customers for the list price increase.

- Throughout the conspiracy, the coconspirators coordinated internal quarterly pricing guidance, including price targets for the sales team to use in negotiating promotions and other discounts below the list price. This coordination also involved agreements on net prices (the prices paid by retailers after discounts are deducted from the list price).

- Throughout the conspiracy, the coconspirators agreed on specific promotional levels that they would—and would not—permit in order to ensure that they maintained the agreed-upon net prices. For example, in the summer of 2011, the conspirators agreed not to offer a popular promotional price of 10 cans of solid white albacore tuna for $10 ("10/$10").

To make it easier to fix the prices of core commodity products such as five-ounce cans of tuna, which comprise the majority of sales for the packaged-seafood companies, the conspirators also agreed to ban new products. In late 2011 and early 2012, Greenpeace launched a campaign criticizing the three tuna companies for using fish-aggregating devices ("FADs"), a certain type of fishing gear, to catch tuna. In response, several of the conspirators' major customers, including Safeway and Costco, requested fishing-gear-specific products, such as FAD-free tuna

or pole-and-line caught tuna.  Defendant and his coconspirators believed that allowing some companies to offer fishing-gear-specific tuna where others did not would also fracture the market and make it more difficult for the conspirators to raise prices of traditional, commoditized canned tuna in concert, and to monitor compliance with pricing agreements.  Accordingly, the CEOs from all three companies agreed in February 2012 to exclude fishing-gear-specific products from their branded line of products.  The three companies reaffirmed this commitment during a trade association meeting in June 2013.

## B.    Enforcement of the Conspiracy

The participants, including defendant, took several steps to ensure that the conspirators complied with the price-fixing agreements.  One way they did so was by monitoring their competitors' retail prices and promotions, and then emailing or calling their coconspirators with examples of pricing that appeared to be below agreed-upon levels.  The conspirators called these communications "jabs."  Jabs were meant to let their competitors know that the conspirators were monitoring prices to ensure that all conspirators followed through on their commitments.  After receiving a jab, the recipient would typically offer explanations and assurances designed to mollify the sender that his company was still in line with the agreement.

Members of the conspiracy also enforced the agreement by confirming that they had implemented the agreed-upon pricing actions.  They did this by, for example, sending each other official pricing announcements as proof that they had followed through on their agreement.

## C.    Defendant's Role in the Conspiracy

During the conspiracy, defendant was President and CEO of Bumble Bee.  As discussed in greater detail in the government's Notice of Coconspirator Statements (Dkt. No. 133), defendant directed, supervised, and approved the formation and implementation of the conspiracy and the conspiratorial communications of his direct reports including Scott Cameron and Ken Worsham; knowingly approved and implemented collusive pricing actions; and had his own direct communications with competitors to enforce and implement the conspiracy.

//

//

## IV.   STIPULATED FACTS

The government has attempted to enter into stipulations regarding evidentiary matters that are not in dispute in an effort to eliminate the need to call multiple foundational witnesses. At present, the parties have agreed on one stipulated fact: that the city of Pleasanton is located in Alameda County in the Northern District of California.

Additionally, the United States has requested that defendant stipulate to the following matters:

- that the charged conspiracy occurred within the flow of interstate commerce;
- that certain exhibits are admissible as self-authenticating business records under Rules 803(6), 902(11), and 902(14);
- that, between November 2010 and December 2013, the conspiratorial agreement or some act in furtherance of the conspiracy occurred in the Northern District of California; and
- that Bumble Bee and COSI have factories in California and Georgia and sell tuna to retailers in all fifty states.

To date, defendant has refused to agree to these stipulations.

The government may propose additional stipulations prior to trial in order to streamline the presentation of this case.  The government requests that defendant notify government counsel prior to trial if he will agree to any or all of the proposed stipulations or if he has other suggestions with respect to stipulated facts.  The agreed-upon stipulations will thereafter be reduced to writing, signed by all parties, filed with the Court, and published to the jury at the appropriate time during the course of the trial.

## V.   LAW APPLICABLE TO SHERMAN ACT OFFENSES

### A.   Elements

The elements of a violation of the Sherman Act are:

*First*, that the charged price-fixing conspiracy existed at or about the time specified in the indictment;

*Second*, that defendant knowingly participated in the conspiracy; and

1    *Third*, that the conspiracy occurred within the flow of interstate commerce.

2    *United States v. Alston*, 974 F.2d 1206, 1210 (9th Cir. 1992); *United States v. AU Optronics*

3    *Corp.*, 09-CR-110 (N.D. Cal. 2012); *United States v. Gary Swanson*, 06-CR-692 (N.D. Cal.

4    2007); ABA Section of Antitrust Law, *Model Jury Instructions in Criminal Antitrust Cases* 47

5    (2009).

6    **B.     Price Fixing Is a *Per Se* Violation of the Sherman Act**

7           As discussed in more detail in the government's Motion *in Limine* No. 1 to Exclude

8    Evidence Irrelevant to a *Per Se* Case (Dkt. No. 220 at 2-4), it is well-settled that price fixing is a

9    *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  *Nat'l Collegiate Athletic Ass'n*

10   *v. Bd. of Regents*, 468 U.S. 85, 100, 107-08 (1984) ("Restrictions on price and output are the

11   paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit.");

12   *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) ("It has long been settled that an

13   agreement to fix prices is unlawful *per se*."); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5

14   (1958) ("Among the practices which the courts have heretofore deemed to be unlawful in and of

15   themselves are price fixing"); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th

16   Cir. 2000) ("No antitrust violation is more abominated than the agreement to fix prices.").  Thus,

17   price-fixing agreements are illegal regardless of any pro-competitive justifications a defendant

18   may offer.  *United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018); *Alston*, 974 F.2d at 1208.

19   Similarly, proof that defendant specifically intended to produce anticompetitive effects is not

20   required: "a requirement that intent go further and envision actual anti-competitive results would

21   reopen the very questions of reasonableness which the *per se* rule is designed to avoid."  *United*

22   *States v. Brown*, 936 F.2d 1042, 1046 (9th Cir. 1991).

23          For the reasons set forth in the government's Motion *in Limine* No. 1, evidence irrelevant

24   to a *per se* case, including justifications and specific intent, should be excluded under Rules 402

25   and 403.  If the Court finds the evidence admissible for a limited purpose, however, the

26   government will seek a limiting instruction making clear that the evidence can only be

27   considered for that limited purpose and that the government is not required to prove that the

28   agreement is effective.

1
2

### C.     The Sherman Act Is a General Intent Statute and the Agreement Is the Crime

3

4        A conspiracy under the Sherman Act is similar to any other criminal conspiracy: a

5    combination of two or more persons or entities engaged in concerted action to accomplish an

6    illegal purpose or to accomplish a legal purpose by illegal means.  *American Tobacco Co. v.*

7    *United States*, 147 F.2d 93, 106-107 (1944); *Alston*, 974 F.2d at 1210.  However, a Sherman Act

7    conspiracy differs from the general conspiracy statute, 18 U.S.C. § 371, in two significant ways.

8        First, unlike 18 U.S.C. § 371, the Sherman Act does not require proof of an overt act.

9    *Nash v. United States*, 229 U.S. 373, 378 (1913).  The conspiratorial agreement itself constitutes

10   the complete criminal offense.  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59

11   (1940).  It is "immaterial whether the agreements were ever actually carried out, whether the

12   purpose of the conspiracy was accomplished in whole or in part, or whether an effort was made

13   to carry the object of the conspiracy into effect."  *Plymouth Dealers' Ass'n of N. Cal. v. United*

14   *States*, 279 F.2d 128, 132 (9th Cir. 1960) (quoting *United States v. Trenton Potteries Co.*, 273

15   U.S. 392, 402 (1927)).

16       Therefore, it is not necessary that any overt acts in furtherance of the conspiracy be

17   alleged or proved and defendant may not raise a defense on these grounds.  *See Socony-Vacuum*,

18   310 U.S. at 224 n.59; *United States v. Miller*, 771 F.2d 1219, 1226 (9th Cir. 1985).

19   Nevertheless, in this case the government will introduce evidence of acts that furthered the

20   conspiracy.  As the Court already found, any overt acts that the government chooses to introduce

21   need not be in and of themselves illegal *per se* as long as they were acts committed in forming or

22   furthering the conspiracy.  (Dkt. No. 177, at 5 n. 2.)  *See also Chavez v. United States*, 275 F.2d

23   813, 817 (9th Cir. 1960) ("It is true that an overt act [in furtherance of a conspiracy] in itself may

24   be a perfectly innocent act standing by itself.").

25       Second, the Sherman Act is a general intent crime, not a specific intent crime.  The

26   elements of a Sherman Act conspiracy do not include or require proof of a specific intent to

27   commit the object of the conspiracy.  *Alston*, 974 F.2d at 1210 ("In a criminal antitrust

28   prosecution, the government need not prove specific intent to produce anticompetitive effects

1   where a per se violation is alleged.")  In order to sustain its burden of proof in this case, the

2   government must only prove beyond a reasonable doubt that the defendant knowingly entered

3   into a conspiracy to fix prices of canned tuna.  The government does not need to show that the

4   defendant acted "with the purpose of achieving anticompetitive effects or with the knowledge

5   that such effects likely would result."  *United States v. Brown*, 936 F.2d 1042, 1046 (9th Cir.

6   1991).

7           **D.      The Agreement Need Not Be Explicit or Formal**

8           The evidence need not show that the competitors entered into an express or formal

9   agreement, or that they directly stated, either orally or in writing, the purpose of the agreement.

10  *United States v. MMR Corp. (LA)*, 907 F.2d 489, 495 (5th Cir. 1990) ("The government … is not

11  required to prove a formal, express agreement with all the terms precisely set out and clearly

12  understood by the conspirators.").  Indeed, no exchange of words is required; "[t]he agreement

13  itself may have been entirely unspoken."  ABA Section of Antitrust Law, *Model Jury

14  Instructions in Criminal Antitrust Cases* 49-50 (2009); *see also Am. Tobacco Co. v. United

15  States*, 328 U.S. 781, 809-10 (1946); *Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir.

16  1965) ("A knowing wink can mean more than words.").

17          **E.      A Single Conspiracy May Include Sub-Agreements**

18          As the government laid out in more detail in its briefing on coconspirator statements (*see*

19  Dkt. No. 184 at 1-5), a single, overarching conspiracy may embrace many lesser agreements.

20  The "general test comprehends the existence of subgroups or subagreements.  The evidence need

21  not be such that it excludes every hypothesis but that of a single conspiracy; rather it is enough

22  that the evidence adequately support a finding that a single conspiracy exists."  *United States v.

23  Arbelaez*, 719 F.2d 1453, 1457-58 (9th Cir. 1983) (cleaned up); *see also United States v. Armco

24  Steel Corp.*, 252 F. Supp. 364, 377 (S.D. Cal. 1966) ("The single conspiracy is the crime, and it

25  matters not how many subsidiary objects of a conspiracy there may be.").  For example, an

26  overarching agreement to raise prices may include lesser agreements such as the elimination of

27  discounts at specific accounts.  Likewise, a single conspiracy need not involve the same

28  //

1   conspirators throughout the entire conspiracy.  *United States v. Patterson*, 819 F.2d 1495, 1502

2   (9th Cir. 1987); *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir. 1969).

3        **F.      Ignorance of the Law Is No Defense**

4            Any evidence or argument that defendant did not know that his conduct was illegal is

5   irrelevant to this case and unduly prejudicial.  As with any criminal prosecution, ignorance of the

6   law is no defense to a Sherman Act violation.  The government incorporates by reference its

7   Motion *in Limine* No. 1.  (Dkt. No. 220 at 5-6.)

8        **G.      Not All Charged Means and Methods Must Be Proved**

9            The evidence need not establish that all of the means and methods set forth in the

10  indictment were agreed upon or utilized to carry out the conspiracy.  *Socony-Vacuum*, 310 U.S.

11  at 249-50; *see also United States v. Kartman*, 417 F.2d 893, 894 (9th Cir. 1969) (holding an

12  unproven allegation in an indictment to be "surplusage . . . unnecessary for the government to

13  prove" when not an element of the charged crime).  Nor must the evidence show that all means

14  and methods agreed upon were actually used or put into operation, *see, e.g.*, *Trenton Potteries*

15  *Co.*, 273 U.S. at 402, or that all persons alleged to have been conspirators were such.  *Weiss v.*

16  *United States*, 103 F.2d 759, 760 (3d Cir. 1939).  The government is also not required to prove

17  that the conspiracy continued for the entire duration charged in the indictment.  *Pittsburgh Plate*

18  *Glass Co. v. United States*, 260 F.2d 397, 401 (4th Cir. 1958), *aff'd*, 360 U.S. 395 (1959);

19  *Cooper v. United States*, 91 F.2d 195, 198 (5th Cir. 1937).  Since the agreement itself is the

20  crime, "the additional allegation in the indictment that the conspiracy was 'continuing' d[oes] not

21  set forth an essential element of the crime."  *Pittsburgh Plate Glass Co.*, 260 F.2d at 401.

22       **H.      Interstate Commerce**

23           The interstate commerce element in Sherman Act cases is jurisdictional and is established

24  by proof that products that were the subject of the conspiracy were either in the flow of interstate

25  or foreign commerce (the "flow" theory) or had or were likely to have a substantial effect on

26  interstate or foreign commerce (the "effects" theory).  *United States v. Giordano*, 261 F.3d 1134,

27  1138 (11th Cir. 2001); *see also United States v. ORS, Inc.*, 997 F.2d 628, 630 (9th Cir. 1993).

28  Here, the price-fixing agreement involved packaged seafood, defined as canned tuna, that was

1  sold in a continuous and uninterrupted flow of interstate commerce because the canned tuna sold

2  pursuant to the price-fixing agreement was transported across state lines as it moved from the

3  manufacturers to the retailers.

4      The term "interstate commerce" includes transactions that move across state lines or that

5  are in a continuous flow of commerce from the commencement of their journey in one state until

6  their final destination in a different state.  The conspiracy charged in the indictment occurred in

7  the flow of interstate commerce if at least one defendant or one coconspirator, in carrying out the

8  charged conspiracy, crossed state lines or caused canned tuna to be shipped across state lines.  If

9  the conduct challenged in the indictment involves transactions that are in the flow of commerce,

10  the interstate commerce element is satisfied and the size of any such transaction is of no

11  significance.

12  **VI.    SCOPE OF TESTIMONY[1]**

13      **A.    Defendant's Expert Witness Disclosure Is Deficient**

14      On July 26, defendant disclosed his intent to present the testimony of expert witness

15  James Levinsohn in his defense.  Defendant failed, however, to disclose anything more than the

16  witness's name.  Usually, defendant would be required to make this disclosure under Rule

17  16(b)(1)(C).  Here, defendant, having already been informed that the government does not intend

18  to call any experts in this trial, has not triggered the application of the rule by making a request

19  for disclosures under Rule 16(a)(1)(G).  Failure to require a more fulsome pretrial disclosure of

20  Dr. Levinsohn's anticipated topics of testimony will lead to a burdensome mid-trial *Daubert*

21  procedure, which will waste the Court's and jury's time and inevitably delay the close of trial.

22  Given the Court's desire to resolve trial and evidentiary issues at the pretrial hearing through the

23  extensive pretrial disclosures it has already ordered, the Court should order defendant to provide

24  a summary describing "the witness's opinions, the bases and reasons for those opinions, and the

25  witness's qualifications" as contemplated by Rule 16 to ensure an efficient and streamlined

26  presentation of evidence and avoid unnecessary mid-trial delays.

27  *//*

28

---

[1] The government has filed a number of separate pretrial motions and oppositions addressing evidentiary issues which are not reiterated here.

As explained in the government's Motion *in Limine* No. 1, any expert testimony regarding the effects of the conspiracy is irrelevant to a *per se* case and would serve to mislead the jury and distract from the sole issue in this case: whether defendant participated in a conspiracy to fix the prices of canned tuna. *See, e.g.*, *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1385-86 (11th Cir. 2011) (no abuse of discretion to exclude defense expert from testifying about matters irrelevant to what the jury must decide). In addition, the Court must be given sufficient information regarding Dr. Levinsohn's background, qualifications, and the bases or reasons for his proposed testimony to be able to determine whether the testimony is proper under Rules 702 and 703 and for the government to make any necessary *Daubert* motions. These issues should be addressed pretrial to avoid undue delay and wasting the jury's time. Therefore, the government requests that this disclosure be made no later than September 3, 2019.

Once that disclosure is made, the government may move to exclude Dr. Levinsohn's testimony as unreliable under *Daubert v. Merrell Dow Pharma.*, 509 U.S. 579, 589 (1993), and as irrelevant and prejudicial under Federal Rules of Evidence 401, 402, and 403. At that time, the government will also request that the Court set a briefing schedule on the government's proposed motion to exclude expert testimony.

### B.    Coconspirators May Testify about the Existence of an Agreement

In its case-in-chief, the government intends to solicit testimony from defendant's coconspirators as to whether the coconspirators reached an "agreement," "understanding," or "promise" to fix prices. Courts in criminal antitrust cases routinely have permitted lay witnesses to testify based on their own direct observations regarding whether an agreement was reached and, if so, what the witness understood the agreement to be. Such testimony regarding a witness's understanding of the agreement is permitted under Rule 701 because that understanding is rationally based on the witness's own personal observations, knowledge, and inferences; is helpful to the jury because it describes a key fact in the case; and is not expert testimony. *See, e.g.*, *United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1234 (8th Cir. 1992); *MMR*, 907 F.2d at 495-96 (admitting lay witness testimony on agreement based on his participation and a factual basis); *United States v. Smith Grading and Paving, Inc.*, 760 F.2d 527,

529 (4th Cir. 1985) (allowing witnesses to testify that defendants "concurred with the [bid-rigging] plan"); *United States v. Metro. Enters. Inc.*, 728 F.2d 444, 447 (10th Cir. 1984) (testimony that conspirators "agreed" on low bidder); *United States v. Cargo Serv. Stations Inc.*, 657 F.2d 676, 680-81 (5th Cir. 1981) (allowing testimony that conspirators reached an "implied understanding" concerning prices); *United States v. Standard Oil Co.*, 316 F.2d 884, 889–90 (7th Cir. 1963) ("[W]itnesses in antitrust cases have uniformly been permitted to testify concerning the existence of agreements and understandings."). In *United States v. New York Great Atlantic & Pacific Tea Co.*, a criminal antitrust case, the Fifth Circuit explained:

> Just as a witness may in a civil suit say, not as a conclusion but as a fact, that he made or entered into an agreement at a certain time and place, so an indictment may charge, and a witness may say, in a criminal case that a defendant made or entered into an agreement at a particular time or in a particular place.

137 F.2d 459, 463 (5th Cir. 1943).

Courts in this district agree. Agreement testimony has been repeatedly permitted in this district—for example, in the four recent bid-rigging trials tried before Judge Hamilton, and the three LCD price-fixing cases tried before Judge Illston. *See United States v. Guillory et al*, No. 14-CR-607 (N.D. Cal. 2014); *United States v. Joyce*, No. 14-CR-607 (N.D. Cal. 2014); *United States v. Florida et al*, No. 14-CR-582-PJH (N.D. Cal. 2014); *United States v. Michael Marr et al*, No. 14-CR-580 (N.D. Cal. 2014); *United States v. Victor Marr*, No. 14-CR-580 (N.D. Cal. 2014); *United States v. Leung*, No. 09-CR-110 (N.D. Cal. 2010); *United States v. Bai*, No. 09-CR-110 (N.D. Cal. 2010); *United States v. AU Optronics Corp. et al*, No. 09-CR-110 (N.D. Cal. 2010).

It is particularly important that the witnesses be permitted to testify about the existence of agreements in this case, because the government anticipates that defendant will argue that neither he nor his subordinates reached agreements, and that they merely exchanged competitive information regarding planned future list price increases. (*See* June 11, 2019 Coconspirator Hr'g. Tr. at 20:8-13.) Testimony by witnesses regarding their understanding of the agreement is therefore necessary to contrast this argument and is permitted under Rule 701 because it is

rationally based upon the witness's own personal observations, knowledge, and inferences; is helpful to the jury because it describes a key fact in the case; and is not expert testimony. *See, e.g.*, *Misle Bus & Equip. Co.*, 967 F.2d at 1234 (holding that a lay witness may testify regarding the existence of an "agreement," "understanding," "promise," or "commitment" to fix price because "those words have well-established lay meanings and do not demand a conclusion as to the legal implications of conduct") (quoting *United States v. Baskes*, 649 F.2d 471, 478 (7th Cir. 1980)). The fact that the issue of whether or not an agreement was reached is the issue at trial is not a bar to this testimony. Under Rule 704(a), "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Therefore, this Court should permit the witnesses to explain in their own words, their understanding of communications with competitors and provide lay opinion testimony regarding their understanding of certain terms used and statements made by coconspirators, as well as the state of mind of coconspirators.

### C.    Circumstantial Evidence May Be Used to Prove a Sherman Act Conspiracy

Courts give the government broad discretion and "wide latitude" in presenting evidence in criminal conspiracy cases, "and it is within the discretion of the trial court to admit evidence which even remotely tends to establish the conspiracy charged." *Nye & Nissen v. United States*, 168 F.2d 846, 857 (9th Cir. 1948), *aff'd*, 336 U.S. 613 (1949); *see also Schino v. United States*, 209 F.2d 67, 74 (9th Cir. 1953). Evidence is thus admissible so long as it assists in proving that an illegal conspiracy was knowingly formed or joined. Accordingly, courts have routinely admitted testimony covering the conspirators' general modus operandi and course of conduct, even if unrelated to specific conspiratorial episodes. *United States v. Murray*, 492 F.2d 178, 190 (9th Cir. 1973) (finding no abuse of discretion in admitting evidence that did not prove the conspiracy charge, but "did tend to show that [defendant] had the knowledge and modus operandi" to carry out the offense); *United States v. Bonnano*, 467 F.2d 17, 17 (9th Cir. 1972) (finding evidence of prior offenses admissible to show that the conspirators were "continuing along the same line"); *United States v. Grande*, 620 F.2d 1026, 1033 (4th Cir. 1980) (permitting a witness to testify as to general pattern of bid-rigging spanning eight years); *United States v.*

1    *Dansker*, 537 F.2d 40, 57-58 (3d Cir. 1976) (permitting a witness to testify about modus

2    operandi of bribery conspiracy).

3         **D.    A Witness's General Recollection Is Probative Evidence**

4         The indictment charges a price-fixing conspiracy that began on or about November 2010.

5    As such, some of the earliest acts of the charged conspiracy go back nearly ten years.  In light of

6    this passage of time, witnesses may have difficulty recalling precise events, dates, and

7    conversations and, given the sheer volume and pattern of collusive communications, may have

8    difficulty distinguishing one specific meeting or conversation from another.  Some witnesses

9    may testify using qualifying expressions such as "I think," "I believe," or "to the best of my

10   recollection."  Similarly, witnesses may testify regarding a "typical" conversation or what was

11   "generally" discussed.

12        Given the passage of time and the sheer volume of the conspiratorial communications,

13   the Court should expect that witnesses will provide certain testimony in the form of a general

14   recollection of a pattern or practice rather than a specific event.  Such testimony is entirely

15   permissible under the Federal Rules of Evidence.  It is also essential for jurors to grasp the full

16   scope of the conspiratorial meetings and conversations and to understand how the conspiracy

17   functioned.  Given the difficulty of recalling conversations precisely, the law permits a witness to

18   testify to the substance or effect of a conversation, or to his "understanding" or "impression" of

19   its meaning, even if he cannot recall its details.  7 Wigmore, Evidence § 2097 (Chadbourn Rev.

20   1978).  Testimony in the form of a witness's "impressions" or "beliefs" is admissible so long as

21   the witness has a minimal present recollection of the events to which he is testifying.  Exact

22   recollection is not required.  3 Wigmore, Evidence § 726 and 728 (Chadbourn Rev. 1970);

23   McCormick, Evidence, § 910 at 21-22 (2d ed. 1972); Graham, Handbook of Federal Evidence, §

24   602.2 (1981).

25        A lack of specific recollection is different from a lack of personal knowledge.  "A person

26   has personal knowledge of a fact which can be perceived by the senses only if he had an

27   opportunity to observe, and has actually observed the fact."  *United States v. Owens*, 789 F.2d

28   750, 754 (9th Cir. 1986), *rev'd on other grounds,* 484 U.S. 554 (1988) (cleaned up).  "[I]t has

1   long been established that 'the result of the witness' observation need not be positive or absolute

2   certainty . . . it suffices if he had an opportunity of personal observation and did get some

3   impressions from this observation.'"   *United States v. Evans*, 484 F.2d 1178, 1181 (2d Cir. 1973)

4   (quoting 2 Wigmore, Evidence § 658 (3d ed. 1940)).   These qualifications go to the *weight* of the

5   testimony and not its *admissibility*.   As such, the testimony is admissible over objection that it is

6   not based upon the witness's personal knowledge.   *Tripp v. United States*, 381 F.2d 320, 321 (9th

7   Cir. 1967) (finding the contention that testimony was vague and uncertain goes to its weight, not

8   its admissibility).   Because the witnesses in this case will be testifying about meetings and

9   communications in which they personally participated, the witnesses will have the requisite

10   personal knowledge, and Rule 602 does not prohibit this testimony.

11        **E.     Background Evidence of Pre-Conspiracy Activity by Coconspirators Is
           Admissible**

12

13        The government intends to offer evidence of communications involving defendant and

14   his coconspirators in the months leading up to the formation of the conspiracy.   As the

15   government argued in its Notice of Coconspirator Statements (Dkt. No. 133), the evidence at

16   trial will establish that the charged conspiracy began as early as September 2010.   Nevertheless,

17   even assuming the conspiracy did not begin until November 2010, evidence of communications

18   prior to the start of the charged conspiracy is still relevant and admissible.

19        Where a conspiracy is alleged, courts have repeatedly admitted evidence from before the

20   conspiracy period charged in the indictment.   Such evidence is relevant to demonstrate the intent,

21   purpose, or aim of the parties who later entered into the conspiracy to fix prices.   *United States v.*

22   *Jones*, 425 F.2d 1048, 1051 (9th Cir. 1970) ("Evidence of acts performed prior to an alleged

23   conspiracy . . . are, and were here 'properly' admissible, not to prove the conspiracy charged, but

24   to show some other material fact, such as an absence of mistake, motive, opportunity, intent,

25   preparation, plan or knowledge."); *United States v. Enright*, 579 F.2d 980, 988 (6th Cir. 1978)

26   ("Our circuit and several others have held that evidence of a conspirator's actions, even though

27   they may have occurred before the beginning of the conspiracy alleged in the indictment, are

28   nevertheless admissible as proof of motive or intent, touching upon the conspiracy charged in the

1  indictment."); *United States v. Dunham Concrete Prods. Inc.*, 475 F.2d 1241, 1250 (5th Cir.

2  1973) (allowing testimony of price-fixing attempts over ten years before the charged conspiracy

3  and stating that "[a]lthough criminal defendants may not be convicted for acts occurring prior to

4  the period of time spanned in the indictment, federal courts in antitrust cases have, for the

5  purpose of showing intent, consistently admitted evidence of conduct prior to the time covered

6  by the indictment"); *United States v. Cont'l Group, Inc.*, 456 F. Supp. 704, 719 (E.D. Pa. 1978)

7  ("It is well settled that evidence of conduct occurring prior to the time period covered by the

8  indictment is admissible for the purpose of demonstrating, *inter alia*, the intent, purpose or aim

9  of the parties to the offense.").  Such evidence is also admissible if it is inextricably intertwined

10 with the conspiracy.  *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir 2004).

11         That is exactly why the government will introduce such evidence here.  Pre-conspiracy

12 communications with competitors regarding peace proposals, internal discussions about the

13 perceived price war, budget and margin goals, financial pressures and expectations such as the

14 costs of the companies' shared marketing campaign and their ability to pass its costs through to

15 customers, among other things, are relevant and admissible to show motive, intent, and purpose,

16 and to the extent they are inextricably intertwined with the conspiracy.

17     **F.     Character Evidence Is Only Allowed for Limited Reasons**

18         **1.     Defendant's Character**

19             **a.     Evidence of Truthfulness or Integrity Is Inadmissible**

20         As a general rule, Federal Rule of Evidence 404(a) provides that "[e]vidence of a

21 person's character or character trait is not admissible to prove that on a particular occasion the

22 person acted in accordance with the character or trait."  Fed. R. Evid. 404(a).  An accused in a

23 criminal case may, however, seek to introduce evidence of "a pertinent trait of character."  Fed.

24 R. Evid. 404(a)(2)(A).

25         It is well established that the general trait of law-abidingness is pertinent to almost all

26 criminal offenses.  *See United States v. Barry*, 814 F.2d 1400, 1402-03 (9th Cir. 1987) (stating

27 that "appellant could have offered the testimony of character witnesses on the subject of his

28 general reputation as a law abiding citizen"); *United States v. Hewitt,* 634 F.2d 277, 279 (5th Cir.

1    1981) (stating that evidence that a defendant is law abiding is always relevant).  Accordingly, the

2    government has no objection to defendant introducing appropriate testimony of this character

3    trait at trial.

4         Character traits of truthfulness and integrity stand on a different footing.  *Hewitt*, 634

5    F.2d at 279.  Character traits such as these are admissible only when those characteristics have

6    been specifically placed in dispute, either through testimony or as an element of the crime.  *Id.*

7    (citations omitted); *accord United States v. Harris*, 491 F.3d 440, 447-49 (D.C. Cir. 2007)

8    (affirming the district court's refusal to allow character evidence of truthfulness in a drug

9    possession case).  Because neither lying nor lack of integrity is an element of the charged crime,

10   evidence concerning truthfulness or integrity should be excluded unless defendant's credibility is

11   specifically attacked.

12           **b.    Specific Acts Evidence Is Not Permissible Regarding Defendant's
                    Character**

13

14        If defendant offers testimony regarding his law-abidingness, the witness who testifies

15   should not be allowed to introduce evidence of specific instances of defendant's conduct.  Rule

16   405 limits the permissible methods of proving character.  The Rule provides that, where

17   admissible, proof of a pertinent character trait "may be proved by testimony about the person's

18   reputation or by testimony in the form of an opinion."  Fed. R. Evid. 405(a).  Inquiry into

19   specific instances of conduct relevant to the trait in question is permitted only on cross-

20   examination.  *See id*.  Therefore, defendant's character witness should be limited to providing

21   testimony as to general reputation or testimony in the form of opinion, and should not be allowed

22   to testify to specific instances of his conduct.  *See*, *e.g., Michelson v. United* States, 335 U.S.

23   469, 476-77 (1948); *United States v. Giese*, 597 F.2d 1170, 1190 (9th Cir. 1979).

24           **2.    Character Evidence Regarding Testifying Witnesses**

25        Any attempts by defendant to impeach the character of the government's witnesses are

26   governed by Rule 608, which limits impeachment to opinion or reputation evidence regarding a

27   witness's character for "truthfulness or untruthfulness."  Fed. R. Evid. 608(a).  Evidence

28   regarding character traits that do not bear on truthfulness may not be a subject of questioning,

even on cross examination.  *See, e.g.*, *United States v. Holt*, 486 F.3d 997, 1002 (7th Cir. 2007) (holding that questioning about reprimands for neglect of duty did not bear on truthfulness); *Wilson v. Muckala*, 303 F.3d 1207, 1216-17 (10th Cir. 2002) (holding that Rule 608(b) properly applied to exclude extrinsic evidence of extra-marital affairs); *United States v. Rosa*, 891 F.2d 1063, 1069 (3d Cir. 1989) ("Bribery, however, is not the kind of conduct which bears on truthfulness or untruthfulness.").

It is within the discretion of the Court to permit inquiry on cross-examination into specific instances of conduct by a witness "if probative of truthfulness or untruthfulness," but specific instances of conduct by a witness may not be proved by "extrinsic evidence." Fed. R. Evid. 608(b).  Thus, if defendant was permitted to inquire on cross-examination about specific instances of conduct and was not satisfied with the witness's answers, defendant would be required to accept those answers and could not offer extrinsic evidence to rebut them.  *United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir. 1993) (stating that a cross-examiner is "stuck with" whatever answer witness gives when cross-examining about specific instances of conduct to prove character); *United States v. Olivo*, 80 F.3d 1466, 1470-71 (10th Cir. 1996) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence." (quoting Fed. R. Evid. 608(b)); *United States v. Herzberg*, 558 F.2d 1219, 1223 (5th Cir. 1977) ("This language prohibits proof by extrinsic evidence even where the prosecutor 'inquires into' prior acts on cross-examination.").

Because extrinsic evidence is not admissible, defendant is required to have a good basis to believe that the alleged specific acts of conduct occurred before inquiring about them.  *United States v. Whitmore*, 359 F.3d 609, 622 (D.C. Cir. 2004) (stating that the general rule is that "the questioner must be in possession of some facts which support a genuine belief that the witness committed the offense or the degrading act to which the question relates") (quoting *United States v. Lin*, 101 F.3d 760, 768 (D.C. Cir. 1996)).  If the Court determines that defendant does not have a good faith basis that the specific conduct occurred, he may not ask any questions about the purported conduct.  Moreover, because the mere mention of specific conduct can be prejudicial,

1  some courts have held that attorneys should warn the court and opposing counsel at sidebar

2  before cross-examining a witness about alleged specific instances of conduct that may be

3  probative of character for truthfulness or untruthfulness.  *See United States v. Schwab*, 886 F.2d

4  509, 513-14 (2d Cir. 1989) (holding that it is necessary for attorneys to notify court in advance if

5  they intend to question witness about misconduct under Rule 608(b)).

6  **G.    Evidence Regarding the Environmental Impact of Fishing Methods Is Not
            Relevant**

7

8       The government has alleged an agreement to restrict competition as to certain types of

9  products ("the fishing-methods agreement") as one of eight means and methods by which the

10  coconspirators carried out the price-fixing conspiracy.  In his motion to dismiss and at the

11  hearing on that motion, defendant made clear his intention to litigate at length whether the

12  fishing-gear-specific products promoted by Greenpeace and requested by retailers were in fact

13  more environmentally friendly than the traditional fishing methods used by the conspirators and

14  promoted by the International Seafood Sustainability Foundation ("ISSF").  (*See* Motion to

15  Dismiss, Dkt. No. 113; Reply to Motion to Dismiss, Dkt. No. 142; May 7, 2019 Hr'g. Tr.)  This

16  issue is irrelevant to defendant's guilt.

17       It is irrelevant whether the fishing methods promoted by the conspirators through ISSF

18  were otherwise lawful (*see* Order Denying Defendant's Motion to Dismiss, Dkt. No. 177 at 5

19  n.2) or more environmentally friendly than the fishing-gear-specific methods promoted by

20  Greenpeace.  The sole question as to the fishing-methods agreement is whether the competitors

21  entered into it to further the price-fixing conspiracy.  Not only is the issue of the environmental

22  impact of certain fishing methods irrelevant to the issue of defendant's guilt, it is also likely to

23  create a lengthy sideshow and distract the jury.

24       Defendant at trial should be limited to introducing testimony refuting the government's

25  theory that the fishing-methods agreement was made in furtherance of the price-fixing

26  conspiracy.  Additional or cumulative evidence regarding the sustainability of alternate fishing

27  methods should be excluded under Federal Rule of Evidence 403, to avoid confusing the issues,

28  misleading the jury, and wasting time.

### H.      Use of a Summary Agent Is Permissible

The government seeks to allow a summary agent to testify regarding the content of certain otherwise-admissible trial exhibits.  The government will make clear the basis for the admissibility of the underlying documents in its concurrent filings and at the pretrial conference.  All the documents the government seeks to introduce through the summary agent are admissible without a percipient or custodial witness.

Rule 611(a) permits the Court to exercise reasonable control over the mode of presenting evidence in order to make the presentation effective for the ascertainment of the truth and to avoid needless consumption of time.  As this Court has found, a "summary witness can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses throughout the trial."  *United States v. Wong*, No. 12-CR-483, 2014 WL 923347, at *10 (N.D. Cal. Mar. 5, 2014).  Indeed, the use a of summary witness is common in white-collar cases in this district.  *See, e.g.*, *United States v. Hussain*, No. 16-CR-462 (N.D. Cal. 2016); *United States v. Guillory et al*, No. 14-CR-607 (N.D. Cal. 2014); *United States v. Joyce*, No. 14-CR-607 (N.D. Cal. 2014); *United States v. Florida et al.*, No. 14-CR-582 (N.D. Cal. 2014); *United States v. Michael Marr, et al.*, No. 14-CR-580 (N.D. Cal. 2014); *United States v. Victor Marr*, No. 14-CR-580 (N.D. Cal. 2014); *United States v. Leung*, No. 09-CR-110 (N.D. Cal. 2010); *United States v. Bai*, No. 09-CR-110 (N.D. Cal. 2010); *United States v. AU Optronics Corp. et al*, No. 09-CR-110 (N.D. Cal. 2010).

In this case, allowing a summary agent to testify about the contents of otherwise-admissible documents will allow the government to present these exhibits in a coherent and organized manner.  The government does not intend to use the summary agent's testimony to characterize the evidence.  It simply intends to offer the agent's testimony to efficiently summarize information about the content of the documents and, where applicable, the author, recipient, and subject matter.

//

//

//

1    **VII.    EVIDENTIARY ISSUES RELATED TO WITNESSES**

2    **A.    Prior Consistent Statements Are Admissible to Rehabilitate a Witness After
3            Impeachment or to Rebut the Implication of Fabrication of Testimony**

4    The government may introduce prior consistent statements either as substantive evidence

5    when offered to rebut an implication of recent fabrication or to rehabilitate a witness after his

6    credibility has been impeached.

7    A prior consistent statement of a witness is admissible as substantive evidence when it is

8    offered to rebut an express or implied charge against that witness of recent fabrication or

9    improper influence or motive. Fed. R. Evid. 801(d)(1)(B). Rule 801(d)(1)(B) provides that "[a]

10   statement is not hearsay if [t]he declarant testifies at the trial or hearing and is subject to cross-

11   examination concerning the statement, and the statement is consistent with the declarant's

12   testimony and is offered to rebut an express or implied charge against the declarant of recent

13   fabrication or improper influence or motive." Courts have admitted prior consistent statements

14   liberally. *See Gaines v. Walker*, 986 F.2d 1438, 1445 (D.C. Cir. 1993); *United States v. Casoni*,

15   950 F.2d 893, 904 (3d Cir. 1991) (finding "there need be only a suggestion that the witness

16   consciously altered his testimony" to allow prior consistent statements into evidence).

17   For prior consistent statements to be admissible under Rule 801(d)(1)(B), the Ninth

18   Circuit requires that:

19       (1) the declarant must testify at trial and be subject to cross-examination; (2) there
20       must be an express or implied charge of recent fabrication or improper influence or
         motive of the declarant's testimony; (3) the proponent must offer a consistent
21       statement that is consistent with the declarant's challenged in-court testimony; and,
22       (4) the prior consistent statement must be made prior to the supposed motive to
         falsify arose.

23   *United States v. Beltran*, 165 F.3d 1266, 1269-70 (9th Cir. 1999) (quoting *United States v.*

24   *Collicott*, 92 F.3d 973, 979 (9th Cir. 1996)).

25   Alternatively, a prior consistent statement may be admissible, not as substantive

26   evidence, but for rehabilitation of the witness following cross-examination. *See United States v.*

27   *Stover*, 329 F.3d 859, 867 (D.C. Cir. 2003) ("These prior statements would not be offered for the

28   truth of the matter asserted . . . and therefore would not need to satisfy Rule 801(d)(1)(B). They

1    would be introduced to show that the witness did not give statements on direct that were

2    inconsistent with what he had said before.").  For this purpose, a prior consistent statement is

3    generally admissible even if made after the alleged inconsistent statement.  *Id.*  The statement

4    sought to be admitted must have a probative value that bears on credibility beyond merely

5    showing repetition; for instance, where the prior statement casts doubt on whether the prior

6    inconsistent statement was in fact made or whether the impeaching statement is actually

7    inconsistent with the trial testimony.  *United States v. Pierre*, 781 F.2d 329, 333-34 (2d Cir.

8    1986).  A prior consistent statement may also be introduced to amplify or clarify an allegedly

9    inconsistent statement.  *Id.*

10       During trial, the government anticipates that it may seek to introduce such statements

11   following the cross-examination of its witnesses.

12       **B.     Out-of-Court Assertions Are Admissible Not for the Truth**

13       While the government has noticed various emails, statements, and reports it seeks to

14   admit into evidence as coconspirator statements pursuant to Rule 801(d)(2)(E), it may seek to

15   introduce a portion of these statements under an alternative basis: that they are not hearsay.

16   Statements by the conspirators regarding their conversations with competitors are circumstantial

17   proof of the conspiracy without reference to the truth of the matter asserted.  The statements are

18   relevant merely because the words were said, not because the subject of the statement was true.

19       Under Rule 801(c), hearsay is "a statement, other than one made by the declarant while

20   testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

21   *United States v. Sims*, 617 F.2d 1371, 1376 n.6 (9th Cir. 1980) (quoting Fed. R. Evid. 801(c)).

22   The Ninth Circuit has repeatedly held that statements between coconspirators are not hearsay

23   where offered as proof of the conspiracy or to establish the purpose and means of the conspiracy

24   and not to prove the truth of the matter asserted.  *United States v. Lim*, 984 F.2d 331, 336 (9th

25   Cir. 1993); *United States v. Lopez*, 803 F.2d 969, 974 (9th Cir. 1986); *United States v. Wolfson*,

26   634 F.2d 1217, 1219 (9th Cir. 1980) ("[W]hen a witness is present at a meeting between a group

27   of conspirators, and they orally, in his presence, agree upon the conspiracy, its objectives, and its

28   modus operandi, the witness' testimony about what each of them said is not hearsay."); *Miller*,

1   771 F.2d at 1233-35 (statements offered to prove declarant's own conduct in furtherance of the

2   conspiracy were not hearsay); *United States v. Calaway*, 524 F.2d 609, 613 (9th Cir. 1975).

3        The pricing discussions between competitors prove two important purposes separate and

4   distinct from the truth or falsity of the statements within them.  First, the fact that these

5   statements were made is circumstantial proof of the conspiracy.  One of the most fundamental

6   ways of proving a conspiracy to fix prices is to show what was said between competitors.  The

7   fact that competitors were discussing pricing is circumstantial proof of the conspiracy itself.  *See*

8   *Miller,* 771 F.2d at 1233-35.  The fact that certain statements were made during conversations

9   between competitors helps establish that a conspiracy existed and shows the conspirators' state

10  of mind.

11       Second, where the statements by conspirators show assent to a pricing proposal, the

12  means and methods of the conspiracy, or the terms of the agreement, the words are not hearsay

13  because they show the "objectives, and its modus operandi" of the conspiracy.  *Wolfson*, 634

14  F.2d at 1218.  These statements are a verbal act that gives rise to legal consequences, and are

15  admissible as nonhearsay.  *Id.*; *see also United States v. Diaz*, 597 F.3d 56, 65 n.9 (1st Cir.

16  2010); *United States v. Hicks*, 848 F.2d 1, 3 (1st Cir. 1988).  The statements have legal

17  significance merely because they were uttered, not because what was said was true.

18       Additionally, some out of court statements are admissible not for the truth of the matter

19  asserted, but to show the "effect on the listener."  These statements may be relevant to prove

20  state of mind, belief or awareness, or to explain subsequent action.  *See, e.g.*, *United States v.*

21  *Connelly*, 395 F. App'x 407, 408 (9th Cir. 2010) (statement that a large check had been drawn in

22  witness's name not hearsay because it was offered to show why the witness took subsequent

23  actions, i.e., why she went to the bank to investigate).

24       **C.**     **Defendant's Hearsay Statements Are Inadmissible**

25       In its case-in-chief, the government intends to introduce statements made by defendant.

26  A statement is not hearsay if it "is offered against an opposing party and: (A) was made by the

27  party in an individual or representative capacity."  Fed. R. Evid. 801(d)(2)(A).  Thus, out-of-

28  court statements made by defendant and offered into evidence *by the government* are not hearsay

1   and are admissible as substantive evidence.  *See* Fed. R. Evid. 801(d)(2)(A) & Advisory

2   Committee's Note; *see also*, *United States v. Singleterry*, 29 F.3d 733, 736-37 (1st Cir. 1994);

3   *United States v. Lebron-Gonzalez*, 816 F.2d 823, 832 (1st Cir. 1987) (affirming admission of

4   tape recordings of defendant's conversations as statements of an opposing party).

5        Because a defendant's statements are admissible only if offered against him, a defendant

6   may not elicit his own prior statements—exculpatory or otherwise—through other witnesses.

7   When these statements are offered by the defendant, they are inadmissible hearsay.  Fed. R.

8   Evid. 801(d)(2)(A); *see United States v. Mitchell*, 502 F.3d 931, 964-65 (9th Cir. 2007); *United*

9   *States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *see also United States v. Palow*, 777 F.2d

10  52, 56 (1st Cir. 1985) ("The requirement of Rule 801(d)(2)(A) that an admission be offered

11  against a party is designed to exclude the introduction of self-serving statements by the party

12  making them."); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant

13  seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it

14  is not admissible.").

## VIII.   EVIDENTIARY ISSUES RELATED TO DOCUMENTS

### A.   Emails Can Be Admissible Under the Business Record Exception

While the government has noticed various email exhibits as coconspirator statements in

accordance with the Local Rules, the government may also seek to introduce some of these

exhibits as business records.  The business record exception to the hearsay rule provides for the

admission of "[a] memorandum, report, record, or data compilation, in any form," if it was (1)

made or based on information transmitted by a person with knowledge at or near the time of the

transaction; and (2) kept in the ordinary course of business.  Fed. R. Evid. 803(6).  *Sea-Land*

*Serv., Inc. v. Lozen Intern., LLC*, 285 F.3d 808, 819 (9th Cir. 2002) (quoting *Miller*, 771 F.2d at

1237).  Business records meeting these criteria are admissible unless "the source of information

or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid.

803(6).

The business records exception applies when "the person furnishing the information . . .

is 'acting routinely, under a duty of accuracy, with employer reliance on the result, or in short in

1  the regular course of business.'"  *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983)

2  (quoting *Clark v. City of Los Angeles*, 650 F.2d 1033, 1037 (9th Cir. 1981)).

3       While emails are not automatically admissible as business records in the Ninth Circuit,

4  *see Monotype Corp. PLC v. Int'l Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994), district courts

5  in the Ninth Circuit have admitted emails under Rule 803(6) upon laying the proper foundation.

6  *Ionian Corp. v. Country Mut. Ins. Co.*, 836 F. Supp. 2d 1173, 1193 (D. Or. 2011) (admitting

7  emails as a business record); *Volterra Semiconductor Corp. v. Primarion, Inc.*, No. 08-CV-5129,

8  2011 WL 4079223, at *7 (N.D. Cal. Sept. 12, 2011) (same).  Indeed, courts have recognized that

9  the practice of sending and receiving emails in the business context has significantly evolved

10  since the Ninth Circuit's decision in *Monotype*.  *Rogers v. Or. Trail Elec. Consumers Coop.,*

11  *Inc.*, No. 10-CV-1337, 2012 WL 1635127, at *8 (D. Or. May 8, 2012).  Where the party seeking

12  to introduce the email can lay an appropriate foundation, particularly as to the declarant's

13  personal knowledge of the events, an email is a proper business record under Rule 803(6).  *See*

14  *Ionian Corp.* 836 F. Supp. 2d at 1193; *Volterra Semiconductor Corp.*, 2011 WL 4079223, at *7.

15       **B.**    **Calendar Entries Are Not Hearsay**

16       The government's exhibit list includes several computerized calendar entries from

17  conspirators' work-based Outlook email accounts.  These calendar entries (*see, e.g.*, App. 1, Ex.

18  32 to United States' Notice of Coconspirator Statements, Dkt No. 133) show the date and time of

19  the proposed meeting, who created the entry, the subject matter of the meeting, and the

20  individuals to whom the invitation was sent.

21       Several of these meetings demonstrate actions taken by coconspirators in furtherance of

22  the conspiracy—for example, calendar entries for meetings to implement pricing actions taken in

23  furtherance of the conspiratorial agreements reached with competitors—and have accordingly

24  been noticed by the government as part of its Coconspirator Notice.  In addition, such

25  computerized calendar entries are admissible, whether or not in furtherance of the conspiracy,

26  because they are (1) not assertions offered for the truth or (2) fall within exceptions to the

27  hearsay rule.

28    *//*

First, calendar entries are not assertions.  They do not contain out-of-court statements or otherwise summarize the contents of the meetings.  The time and date of electronic calendar entries, such as the electronic record of a sent or accepted Microsoft Outlook calendar invite, are not statements made by a person; they are results generated by a computer.  *See, e.g.*, *United States v. Moon*, 512 F.3d 359, 362 (7th Cir. 2008) ("[T]he instruments' [an infrared spectrometer and a gas chromatograph] readouts are not 'statements.'"); *United States v. Washington,* 498 F.3d 225, 230-31 (4th Cir. 2007) (finding the printed result of a computer-based test was not the statement of a person and thus would not be excluded as hearsay); *United States v. Hamilton,* 413 F.3d 1138, 1142-43 (10th Cir. 2005) (finding a computer-generated header information was not hearsay as "there was neither a 'statement' nor a 'declarant' involved here within the meaning of Rule 801"); *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003) ("[N]othing 'said' by a machine . . . is hearsay.") (quoting 4 Mueller & Kirkpatrick, Federal Evidence § 380, at 65 (2d ed. 1994)).  Additionally, the calendar entries will not be offered for the truth.  They will not be used to demonstrate that a meeting on a particular subject occurred on a particular day, only the present intention to have a meeting in the future.

Second, even if the Court finds that the calendar entries are hearsay, the government will provide sufficient foundation that the documents are admissible as business records under Rule 803(6).  The entries were created in the regular course of business and were made with regularity at or near the time of the calendared event with no indicia of unreliability, and the foundation for the business record will be laid by either the creator or a recipient of the calendar invitation.  The calendar entries are also admissible under Rule 803(3) as a then-existing mental impression, demonstrating a present-sense intention to meet at the time and date and for the purposes indicated in the Outlook entry.

## C.     Email Strings Can Be Admissible in Their Entirety for Context

The government has noticed portions of email strings where certain messages within the chain are not offered for the truth, are not an assertion, or otherwise fall into a hearsay exception under Rule 803.  However, the entire email string can be admitted for context.  "Statements providing context for other admissible statements are not hearsay because they are not offered

for their truth." *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006); *see United States v. Gouveia*, 468 Fed. Appx. 793, 796 (9th Cir. 2012) (finding statements admitted for context were not offered for the truth of the matter asserted); *United States v. Whitman*, 771 F.2d 1348, 1352 (9th Cir. 1985) (same); *United States v. Eppolito*, 646 F. Supp. 2d 1239, 1240-41 (D. Nev. 2009) (same); *see also United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002) ("[S]tatements are not hearsay to the extent they are offered for context and not for the truth of the truth of the matter asserted."). Similarly, the other emails in the thread can be admitted for a non-hearsay purpose—for example, to show the effect on the recipient. *See supra* Section VI.A.

## IX.    RECIPROCAL DISCOVERY OF DEFENSE SUBPOENAED DOCUMENTS

The government repeatedly requested—in person, in writing, and before the Court—that defendant produce reciprocal discovery pursuant to Rule 16(b). On February 15, 2019, the defense represented that it was currently unaware of any discoverable documents that the government did not already possess, but would continue to abide by any applicable obligations under Rule 16. Since that time, the government has been made aware that defendant has subpoenaed a number of third parties seeking information and documents not previously produced to the government. Although the government has gone far beyond its disclosure obligations in this case, and despite the fact that the defense has issued numerous under-seal Rule 17 subpoenas and the government's repeated requests for these materials, the defense has not, to date, provided any reciprocal discovery.

The purpose of the defendant disclosure requirement is to ensure that discovery is "a two-way street." *United States v. Stackpole*, 811 F.2d 689, 697 (1st Cir. 1987); *see also United States v. Bump*, 605 F.2d 548, 551-52 (10th Cir. 1979) (requiring reciprocal disclosure despite defendant's objection that it would violate his constitutional rights). A defendant who does not comply risks the sanctions set forth in Rule 16(d)(2), including the exclusion of evidence. *See, e.g.*, *United States v. Scholl*, 166 F.3d 964, 972 (9th Cir. 1999) (affirming exclusion of evidence apparently withheld so that government would be unable to fully investigate); *United States v. Crook*, 479 Fed. Appx. 568, 575-76 (5th Cir. 2012) (affirming exclusion of expert witness

//

testimony because its untimely disclosure would have significantly prejudiced the government). The government once again reiterates its request for reciprocal discovery.

## X.      CONCLUSION

The United States will provide additional briefing or information as requested by the Court, and respectfully requests leave to file such supplemental memoranda as may be necessary before or during trial in this case.


Dated: August 6, 2019                          Respectfully submitted,


                                               /s/ *Mikal J. Condon*
                                               MICAH L. RUBBO
                                               LESLIE A. WULFF
                                               MIKAL J. CONDON
                                               ANDREW SCHUPANITZ
                                               Trial Attorneys
                                               U.S. Department of Justice
                                               Antitrust Division