MICAH L. RUBBO (CSBN 267465)
LESLIE A. WULFF (CSBN 277979)
MIKAL J. CONDON (CSBN 229208)
ANDREW SCHUPANITZ (CSBN 315850)
U.S. Department of Justice, Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 934-5300
micah.rubbo@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER LISCHEWSKI,<br><br>Defendant. | No. 18-cr-00203-EMC<br><br>**UNITED STATES OPPOSITION TO DEFENDANT'S MOTIONS *IN LIMINE* # 3-6 REGARDING RULE 404(B) EVIDENCE**<br><br>Date: August 27, 2019<br>Time: 10:30 a.m.<br>Judge: Hon. Edward M. Chen<br>Courtroom: 5, 17th Floor |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 2

    I.     Communications Before the Conspiracy ................................................................ 2

    II.    "Tuna the Wonderfish" Marketing Campaign......................................................... 3

    III.   Bumble Bee and COSI Copacking Agreement....................................................... 4

    IV.   Discussions Regarding Other Packaged Seafood Products ..................................... 4

    V.    Civil Lawsuits Regarding Underfilling of Cans ...................................................... 4

ARGUMENT ........................................................................................................................... 6

    I.     Pre-Conspiracy Competitor Communications Related to Downsizing and Pricing Are Admissible ....................................................................................................... 6

         A.    The Communications Are Inextricably Intertwined with the Conspiracy .. 6

         B.    Alternatively, the Communications Are Admissible Under Rule 404(b)... 7

         C.    The Communications Satisfy the Rule 403 Balancing Test ....................... 9

    II.    Competitor Communications Regarding Pricing of Sardines, Salmon, and Pouch Tuna Is Admissible .................................................................................................. 10

    III.   Competitor Communications Regarding the "Tuna the Wonderfish" Campaign Are Admissible .......................................................................................................... 12

    IV.   Competitor Communications Regarding the Copacking Agreement Are Admissible .............................................................................................................. 13

    V.    Competitor Communications Regarding the Fish-Fill Lawsuit Are Admissible.. 14

CONCLUSION...................................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Huddleston v. United States*, 485 U.S. 681 (1988) ........................................................................ 7

*Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128 (9th Cir. 1960) .................. 11

*United States v. Aleman*, 592 F.2d 881 (5th Cir. 1979) ........................................................ 5, 10, 11

*United States v. Anderson*, 741 F.3d 938 (9th Cir. 2013) ..................................................... 5, 13, 14

*United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012) ..................................................................... 8

*United States v. Basinger*, 60 F.3d 1400 (9th Cir. 1995) ................................................................ 6

*United States v. Chea*, 231 F.3d 531 (9th Cir. 2000) ...................................................................... 5

*United States v. Conners*, 825 F.2d 1384 (9th Cir. 1989) .......................................................... 7, 12

*United States v. DeGeorge*, 380 F.3d 1203 (9th Cir. 2004) .................................................... passim

*United States v. Dorsey*, 677 F.3d 944 (9th Cir. 2012) ................................................................... 5

*United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir. 1988) ................................................. 8

*United States v. Feldman*, 788 F.2d 544 (9th Cir. 1986) .............................................................. 15

*United States v. Hill*, 953 F.2d 452 (9th Cir. 1991) ........................................................................ 6

*United States v. Lillard*, 354 F.3d 850 (9th Cir. 2003) ................................................................ 15

*United States v. Lindsay*, 2019 WL 3294032, (9th Cir. July 23, 2019) .......................................... 6

*United States v. Livoti*, 196 F.3d 322 (2d Cir. 1999) ..................................................................... 9

*United States v. McKoy*, 771 F.2d 1207, 1214 (9th Cir. 1985) ....................................................... 6

*United States v. Mehrmanesh*, 689 F.2d 822 (9th Cir. 1982) ........................................................ 5

*United States v. Normandeau*, 800 F.2d 953 (9th Cir. 1986) ......................................................... 7

*United States v. Rude*, 88 F.3d 1538 (9th Cir. 1996) ...................................................................... 9

*United States v. Soliman*, 813 F.2d 277 (9th Cir. 1987) .......................................................... 10, 11

*United States v. Trenton Potteries Co.*, 273 U.S. 392 (1927) ....................................................... 11

*United States v. Verduzco*, 373 F.3d 1022 (9th Cir. 2004) .......................................... 6, 9, 11, 13

*United States v. Vizcarra-Martinez*, 66 F.3d 1006 (9th Cir. 1995) ................................. 10, 12, 14

*United States v. Vo*, 413 F.3d 1010 (9th Cir. 2005) ....................................................................... 9

*United States v. Williams*, 989 F.2d 1061 (9th Cir. 1993) .......................................................... 5

*United States v. Yagi*, No. 12-CR-0483, 2013 WL 10570994 (N.D. Cal. Oct. 17, 2013) .......... 7, 9

**Rules**

Fed. R. Evid. 403 ................................................................................................................... 6

Fed. R. Evid. 404(b) ................................................................................................. 5, 7, 14, 15

**INTRODUCTION**

Defendant wrongly seeks to exclude, and thus deny the jury, a large swath of relevant, incriminatory evidence by claiming that it is barred by Federal Rule of Evidence 404(b). It is not.

Defendant's Motions *in Limine* Nos. 4, 5, and 6 seek to exclude the following evidence:

- evidence of competitor communications concerning pricing from 2008 until the start of the conspiracy, including the decision to decrease the size of the most commonly sold canned tuna product from six ounces to five ounces (Defendant's Motion *in Limine* # 4);
- evidence of competitor communications during the charged conspiracy concerning pricing of products other than canned tuna (Defendant's Motion *in Limine* # 5); and
- evidence of competitor communications regarding increased costs resulting from the settlements of civil lawsuits brought against the companies for underfilling their products (Defendant's Motion *in Limine* # 6).

The evidence defendants seek to exclude is inextricably intertwined with the charged conspiracy and thus is not subject to Rule 404(b). Even if Rule 404(b) applies to some of the evidence, however, that evidence is admissible because it may be offered for a proper purpose, including showing defendant's knowledge, intent, absence of mistake, opportunity, and motive.

Nor is any of the evidence unfairly prejudicial or inflammatory. Rather, it permits the government to provide a coherent and comprehensible story regarding the commission of the charged conduct. While the evidence is undoubtedly incriminating, it is incriminating not because it shows defendant has a propensity towards criminal activity. The evidence, instead, shows the full scope of the price-fixing conspiracy and the fact that defendant had the intent, opportunity, and motive to commit the crime charged in the indictment. Accordingly, defendant's Motions *in Limine* #s 4-6 should all be denied.

In Motion *in Limine* # 3, defendant also seeks to exclude argument that an industry-wide campaign called "Tuna the Wonderfish" and a joint venture agreement between Bumble Bee and Chicken of the Sea ("COSI") known as the "copacking agreement" are illegal. (Defendant's

Motion *in Limine* # 3, Dkt. No. 207.)  Defendant concedes that reference to the Tuna the Wonderfish campaign and copacking agreement may arise during trial, but argues that the government should be precluded from introducing any evidence that either was "illegal or nefarious in any way." (Dkt. No. 207 at 1.)  The government does not intend to argue that either arrangement, in and of itself, was unlawful.  Otherwise lawful acts can be in furtherance of a criminal conspiracy, however, and Rule 404(b) does not preclude the government from arguing that both arrangements furthered the criminal conspiracy.  (*See* Order Denying Defendant's Motion to Dismiss (Dkt. No. 177).)  Additionally, these meetings provided opportunity for collusive communications which precipitated and later furthered the price-fixing conspiracy.  Because defendant seeks to exclude such evidence or argument (Dkt. No. at 5-7), the government opposes his motion.  To the extent defendant only seeks to limit argument that the joint ventures were in and of themselves unlawful, the government does not oppose defendant's Motion *in Limine* # 3.

## FACTUAL BACKGROUND

As charged in the indictment, beginning in or about November 2010 until December 2013, defendant knowingly participated in a conspiracy to fix prices of canned tuna.  In order to understand the relevance of the evidence defendant is wrongly seeking to exclude, the government provides the following factual summary of the different categories of evidence:

**I.      Communications Before the Conspiracy**

Although the charged conspiracy began around November 2010, in the years leading up to the conspiracy defendant and others within Bumble Bee fostered relationships and built trust with competitors through communications concerning the prices of various packaged-seafood products.  These competitor communications shared many of the same attributes of communications during the charged conspiracy: sharing future pricing information about list prices, net prices, and pricing guidance; verifying promotional offerings; discussing changes in fish costs and consumer demand that could affect pricing; discussing whether to raise prices; and deciding what type of price increase to announce.  These communications focused on canned and pouch tuna, but also related to other packaged-seafood products, such as salmon.  After obtaining

No. 18-cr-00203-EMC                                    2

competitors' pricing information, executives often circulated that pricing internally, where they used it to make pricing decisions. Scott Cameron and Ken Worsham of Bumble Bee regularly informed defendant of their pricing discussions with competitors.

These discussions also included whether to reduce the size of ("downsize") the most popular tuna product, six-ounce cans, to five ounces. In the fall of 2007 and continuing into the spring of 2008, defendant and others at Bumble Bee discussed the downsizing decision with executives from COSI and StarKist. These conversations included the impact of the decision to downsize, how to respond to customers, and the impact on the business if the companies did not downsize together. In March 2008, defendant and Bumble Bee COO Doug Hines met with COSI CEO Shue Wing Chan and SVP John Sawyer at Milton's restaurant in San Diego. At that meeting, defendant and Chan agreed to downsize.

## II. "Tuna the Wonderfish" Marketing Campaign

Shortly before the conspiracy began, defendant spearheaded an industry-wide growth initiative termed "Tuna the Wonderfish," which he arranged with executives from Bumble Bee's competitors. The campaign was designed to increase the demand for shelf-stable tuna through advertisements and promotions similar to the "Got Milk" campaign—that is, advertisements focused on the industry as a whole rather than any specific brand. The evidence will show that defendant was a driving force behind this campaign. He believed, and worked to convince his competitors, that the campaign had the potential to reverse the declining sales across the category.

Over the course of these meetings, the competitors also agreed to split the cost of the campaign based on market share. The evidence will show that defendant understood, based on his discussions during these meetings and information he relayed to Cameron and Worsham afterwards, that the competitors would pass along the costs of the marketing campaign to customers through higher pricing. The competitors even coordinated with each other regarding how they would notify their shared customers about the need for higher prices to subsidize the campaign. In turn, defendant directed his subordinates to raise the prices of tuna products to

//

cover the costs of the campaign and assured them that competitors would follow suit. Defendant also incorporated the price increase and higher volume expectations into Bumble Bee's budget.

### III. Bumble Bee and COSI Copacking Agreement

In April 2012, Bumble Bee and COSI entered into a copacking agreement to share each other's packing facilities at their plants in Lyons, Georgia and Santa Fe Springs, California. This business venture, while lawful, provided defendant with the opportunity to meet and talk more frequently with Chan, building a closer relationship that eventually led to discussions and agreements regarding pricing.

### IV. Discussions Regarding Other Packaged Seafood Products

Once the conspiracy began, defendant and his coconspirators continued to discuss and agree on prices of canned tuna. Over the course of these discussions, they also occasionally discussed other packaged-seafood products such as pouch tuna and sardines. For example, at the very outset of the conspiracy, Cameron of Bumble Bee talked to Chuck Handford of StarKist about the price of pouch tuna. They agreed that Bumble Bee would not attack StarKist's market share in pouch tuna, and that StarKist in turn would refrain from aggressively pricing canned albacore, Bumble Bee's most important product. Throughout the conspiracy, the competitors continued to exchange email and verbal "jabs" complaining about each other's retail pricing for sardines, salmon, and pouch tuna products. For example, after defendant confronted Chan about COSI's cheap pricing at a Milton's restaurant meeting in March 2012, he began to email Chan examples of low pricing he was seeing in the marketplace. Similarly, in May 2012, defendant emailed Chan about COSI's sardine pricing, commenting "WOW . . . can I source sardines from you?"

### V. Civil Lawsuits Regarding Underfilling of Cans

The coconspirators also discussed civil lawsuits that were filed against the companies for underfilling their canned-tuna products. In 2010, district attorneys' offices in San Diego, Marin, and Riverside counties in California sued Bumble Bee, StarKist and COSI for underfilling their canned-tuna products. The settlements resulting from these suits, which occurred during the charged conspiracy, increased the costs for all the companies by requiring the companies to put

more product in the finished cans. The coconspirators communicated with each other regarding whether to raise prices in response to the new fish-fill requirements, ultimately agreeing to do so. Chuck Handford of StarKist reported to other StarKist employees the information he learned about COSI's anticipated pricing response to the fish-fill requirements. Steve Hodge of StarKist and Ken Worsham of Bumble Bee discussed whether and how to inform customers about the settlement.

## LEGAL STANDARD

Evidence of a "crime, wrong, or other act" is not admissible to prove a defendant has a propensity towards criminal conduct. *See* Fed. R. Evid. 404(b). Rule 404(b) is not applicable, however, if the "other act evidence" is "'inextricably intertwined' with the charged conspiracy." *United States v. Anderson*, 741 F.3d 938, 949 (9th Cir. 2013) (quoting *United States v. Dorsey*, 677 F.3d 944, 951 (9th Cir. 2012)). Inextricably intertwined evidence is "independently admissible and is exempt from the requirements of Rule 404(b)." *Id.* Such evidence includes "evidence constituting 'a part of the transaction that serves as the basis for the criminal charge'" as well as "evidence that is 'necessary to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'" *Id.* Accordingly, Rule 404(b) is not applicable "when offenses committed as part of a 'single criminal episode' become other acts simply because the defendant is indicted for less than all of his actions." *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993) (quoting *United States v. Aleman*, 592 F.2d 881, 885 (5th Cir. 1979)).

Other acts evidence that is not "inextricably intertwined" to the charged offense is nevertheless admissible if offered for a proper purpose and the government provides the defendant with notice. Fed. R. Evid. 404(b). Rule 404(b) is a rule "'of inclusion,' in that 'other acts evidence is admissible whenever relevant to an issue other than the defendant's criminal propensity.'" *United States v. Chea*, 231 F.3d 531, 534 (9th Cir. 2000) (quoting *United States v. Mehrmanesh*, 689 F.2d 822, 830 (9th Cir. 1982)). Permitted uses of "other act" evidence include proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). Additionally, other acts evidence "may be relevant to

show the background and development of [a] conspiracy." *United States v. Hill*, 953 F.2d 452, 457 (9th Cir. 1991) (citing *United States v. McKoy*, 771 F.2d 1207, 1214 (9th Cir. 1985)).

The Ninth Circuit uses a four-part test to determine whether other acts evidence is admissible under Rule 404(b). Under that test, the Court should admit other acts evidence if "(1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged." *United States v. Verduzco*, 373 F.3d 1022, 1027 (9th Cir. 2004) (citations omitted).

Additionally, a court must consider whether the prejudicial effect of the other act evidence substantially outweighs its probative value. *United States v. Basinger*, 60 F.3d 1400, 1408 (9th Cir. 1995) (citing Fed. R. Evid. 403). However, when "evidence may allow the jury to draw a propensity inference, but may also allow the jury to evaluate a legitimate purpose . . . , the mere fact of the potential propensity inference does not render the evidence inadmissible." *United States v. Lindsay*, 2019 WL 3294032, at *11 (9th Cir. July 23, 2019).

## ARGUMENT

### I. Pre-Conspiracy Competitor Communications Related to Downsizing and Pricing Are Admissible

Evidence of competitor communications about pricing and downsizing predating the conspiracy is inextricably intertwined with the charged price-fixing conspiracy or admissible under Rule 404(b), not unfairly prejudicial, and thus admissible against defendant.

#### A. The Communications Are Inextricably Intertwined with the Conspiracy

The mere fact that the evidence predates the charged conspiracy is no bar to admissibility as inextricably intertwined with the charged conduct. Evidence from outside the charge period is inextricably intertwined if it is preliminary to or part of telling the story of the charged conduct. *See United States v. DeGeorge*, 380 F.3d 1203, 1219-20 (9th Cir. 2004). In *DeGeorge*, the defendant sought to exclude evidence that he had previously lost vessels at sea from his pending prosecution for conspiracy, mail fraud, wire fraud, and perjury stemming from the defendant scuttling a yacht in order to collect insurance proceeds. *Id.* at 1208. The Ninth Circuit held the

U.S. OPP. TO DEFENDANT MILS RE 404(B) EVID.
No. 18-cr-00203-EMC                                6

evidence of the prior losses was properly admitted as inextricably intertwined with the charged conduct because it had "an important factual connection" to the charged counts. *Id.* at 1220. So too here. The competitor communications concerning price and downsizing that predate the charged conspiracy provide necessary context and background to understand the conspiracy and the association among the coconspirators.[1] These communications describe how the competitors knew each other and came to trust each other enough to enter into the price-fixing conspiracy. The communications are therefore admissible as inextricably intertwined with the charged price-fixing conspiracy.

### B.  Alternatively, the Communications Are Admissible Under Rule 404(b)

Even if the competitor communications predating the conspiracy fall within the scope of Rule 404(b), the evidence is nonetheless admissible. In a conspiracy case such as this one, other act evidence involving the defendant and his coconspirators may be "relevant to show their association and circumstantial evidence that they acted in concert and planned criminal activities." *United States v. Conners*, 825 F.2d 1384, 1390 (9th Cir. 1989) (citing *United States v. Normandeau*, 800 F.2d 953, 956–57 (9th Cir. 1986)). These communications serve that purpose. The early communications between competitors show the evolution of the relationships between conspirators and provide context for the trust and familiarity between them that occasioned the price-fixing conspiracy.

The competitor communications predating the charged conspiracy are also admissible for the purpose of showing absence of mistake, intent, opportunity, and motive. Fed. R. Evid. 404(b). The Supreme Court has held that other act evidence under Rule 404(b) "should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). Here, the

---

[1] *DeGeorge* forecloses defendant's contention that conduct predating the charged conspiracy can *never* be in inextricably intertwined with a charged conspiracy. (*See* Defendant's Motion *in Limine* # 4, Dkt. No. 208 at 3.) Defendant's reliance on *United States v. Yagi*, No. 12-CR-0483, 2013 WL 10570994 (N.D. Cal. Oct. 17, 2013), is misplaced. In *Yagi*, a defendant who served as a public administrator was charged with stealing from decedent estates. *Id.* at *8. This Court merely found that evidence of conduct from three years prior, before he was appointed as a public administrator, was not inextricably intertwined with the charged conduct. *Id.* at *9.

U.S. OPP. TO DEFENDANT MILS RE 404(B) EVID.
No. 18-cr-00203-EMC                              7

government will present witness testimony for the jury to consider regarding defendant's personal involvement in many of the pre-conspiracy pricing discussions. For example, the fact that defendant was aware of the ongoing nature of the competitor communications going back to well before the charged conspiracy is relevant to defendant's knowledge of the same conduct during the charged conspiracy. It also provides context for the pricing information others were providing him during the conspiracy period and the sources of such information. Defendant's apparent defense that he did not knowingly participate in the conspiracy is significantly less plausible given the evidence showing his knowledge of pricing coordination before the conspiracy.[2]

      Regardless of whether these pricing discussions predating the conspiracy culminated in agreements, the fact that competitors were discussing prices at all indicates they had the knowledge and opportunity to fix prices during the charged conspiracy. Therefore, evidence of pre-conspiracy competitor communications is admissible to show defendant had the opportunity to commit the crime. While defendant does not dispute that executives communicated with each other, defendant has not offered to stipulate regarding the purpose or frequency of the communications. *See United States v. Dynalectric Co.*, 859 F.2d 1559, 1581 (11th Cir. 1988) (finding evidence of prior bid rigging relevant to show intent despite defendant's offer to stipulate because it was "meaningless to offer to stipulate that if the defendants met *and* agreed to rig bids, they intended to restrain trade") (emphasis in original). Moreover, the communications and coordination concerning downsizing show defendant and his coconspirators sought to have a homogenous product, making it easier to fix prices in the future.

      Competitor communications predating the conspiracy also show motive to enter into the conspiracy because defendant and his coconspirators discussed profit margins and what they perceived to be a price war between the three companies. The fact that "corporations eternally

---

[2] This case is therefore readily distinguishable from *United States v. Bailey*, 696 F.3d 794 (9th Cir. 2012), cited by defendant. In *Bailey*, the Ninth Circuit held that evidence of a SEC complaint filed against defendant, which was settled with no admission of liability by the defendant, was insufficient to show the defendant committed the other act. *Id.* at 799-800. Here, however, defendant does not dispute that his subordinates engaged in price-related discussions with competitors that predate the conspiracy.

strive to increase profit margins" (Dkt. No. 208 at 6) does not preclude introducing evidence that defendant and his coconspirators discussed their financial motives for price fixing before the charged conspiracy.

In addition to having a proper evidentiary purpose under Rule 404(b), the competitor communications predating the conspiracy are not too remote in time. Conversations regarding downsizing occurred less than three years prior to the charged conspiracy, and the pricing communications continued through the start of the charged conspiracy. *See United States v. Vo*, 413 F.3d 1010, 1017-19 (9th Cir. 2005) (admitting evidence of 13-year-old conviction under Rule 404(b)); *United States v. Rude*, 88 F.3d 1538, 1550 (9th Cir. 1996) (holding eight-year-old prior act admissible).[3] As discussed above, sufficient evidence exists to show that defendant committed the other acts at issue. Thus, the pre-conspiracy communications are admissible under the Ninth Circuit's four-part test. *Verduzco*, 373 F.3d at 1027 (citations omitted).

### C.     The Communications Satisfy the Rule 403 Balancing Test

Finally, there is no basis to exclude the evidence under Rule 403. First, the evidence is necessary to tell a complete story of the charged conspiracy and is highly probative of defendant's intent, opportunity, and motive, as discussed above. Second, the evidence is not unfairly prejudicial. Competitor communications predating the conspiracy are no more inflammatory than the charged conduct. *See Yagi,* 2013 WL 10570994, at *10 (quoting *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999) (rejecting a Rule 403 challenge in part because the "evidence did not involve conduct more inflammatory than the charged crime").

Moreover, contrary to defendant's assertion, admitting evidence of previous pricing communications will not "lead to lengthy mini-trials." (Dkt No. 208 at 7.) The government does not intend to devote considerable time to conduct occurring before the charged conspiracy. To the contrary, this testimony will be brief and will be offered merely as a prelude to the charged conspiracy.

---

[3]     Unlike in *Yagi*, in which this Court excluded evidence of the defendant's possession of a Rolex watch before he was appointed public administrator, here defendant was the CEO of Bumble Bee at all times during the pre-conspiracy communications the government seeks to admit. *See Yagi,* 2013 WL 10570994, at *8.

U.S. OPP. TO DEFENDANT MILS RE 404(B) EVID.
No. 18-cr-00203-EMC                                         9

Lastly, defendant's argument that communications predating the conspiracy should be excluded because the "government never charged Mr. Lischewski or any of his colleagues for engaging in unlawful conduct predating the alleged conspiracy" is not relevant.  (*See* Dkt. No. 208 at 6.)  Evidence is not excludable merely because a "defendant is indicted for less than all of his actions." *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987) (quoting *Aleman*, 592 F.2d at 885).  Moreover, "the mere fact of the potential propensity inference does not render the evidence inadmissible." *Lindsay*, 2019 WL 3294032, at *11.  Accordingly, evidence of competitor communications concerning pricing and downsizing that predated the conspiracy is admissible against defendant.

### II.  Competitor Communications Regarding Pricing of Sardines, Salmon, and Pouch Tuna Is Admissible

Evidence of competitor communications regarding the pricing of other seafood products is inextricably intertwined with the charged price-fixing conspiracy, is not unfairly prejudicial, and thus is admissible against defendant.

The noticed evidence is often literally intertwined with evidence of the charged conduct.  For example, conversations about pouch tuna helped maintain the price-fixing conspiracy with regards to canned tuna.  As described above, Bumble Bee and StarKist discussed a mutual decision to stop attacking each other's core products—albacore cans and pouch tuna, respectively—in the same conversation.  The witness testimony regarding pouch tuna cannot be excised from this conversation without requiring witnesses to testify about their competitor contacts in an artificial and piecemeal fashion.  The pouch communications are therefore "a part of the transaction that serves as the basis for the criminal charge" and thus inextricably intertwined with the charged conspiracy.  *DeGeorge*, 380 F.3d at 1220 (quoting *United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir. 1995)).

Indeed, documents exchanged during the conspiracy refer to competitor pricing information on canned tuna as well as pricing on other items such as pouch, salmon, or sardines.  The coconspirators discussed this evidence together because monitoring pricing on other products helped the conspirators monitor compliance with the conspiracy.  Accordingly,

discussions regarding the pricing of products not covered by the charged conspiracy were nonetheless part of the same criminal episode. *See Soliman*, 813 F.2d at 279. Therefore, the "policies underlying [Rule 404(b)] are simply inapplicable." *Id.* (quoting *Aleman*, 592 F.2d at 885).

Jabs concerning uncharged products are nonetheless inextricably intertwined with the charged conspiracy and not other acts evidence. These communications occurred contemporaneously and in conjunction with the pricing conversations about canned tuna. Just a few weeks after the emails about sardines described above, defendant again emailed Chan about low promotions on canned tuna. Defendant linked the emails together, writing "Shu Wing, I don't mean to keep peppering you with these but how can this be possible with fish cost above $2,100/ton? This places the credibility of our entire industry in question. I pulled this out of my mail at home yesterday."[4] These communications plainly indicate that they are part of the same "single criminal episode" and do not become inadmissible just because defendant was "indicted for less than all of his actions." *Id.* (quoting *Aleman*, 592 F.2d at 885).

Even if the communications do constitute "other acts" under Rule 404(b), they are nonetheless admissible to show knowledge, intent, absence of mistake, and opportunity. Defendant's emails to Chan regarding the low price of COSI's sardines are relevant to show his knowledge and intent when sending those same emails regarding canned tuna. The fact that defendant thought COSI's low pricing of sardines jeopardized "our entire industry" shows defendant had a motive to fix prices of canned tuna. Moreover, the pricing discussions occurred at the same time as the communications regarding canned tuna and were plainly similar to the charged conduct. *See Verduzco*, 373 F.3d at 1027 (finding Rule 404(b) evidence admissible in cases where the other act is not too remote in time and the other act is similar to

//

---

[4] Defendant claims his email jab to Chan was followed by COSI further reducing sardine prices. However, it is "immaterial whether the agreements were ever actually carried out, whether the purpose of the conspiracy was accomplished in whole or in part, or whether an effort was made to carry the object of the conspiracy into effect." *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960) (quoting *United States v. Trenton Potteries Co.*, 273 U.S. 392, 402 (1927)). Moreover, Chan understood the purpose of defendant's email was to remind him of their price-fixing agreement.

the offense charged (when knowledge and intent are at issue)).  Moreover, defendant admits that he engaged in the pricing discussions concerning the other products.  (*See* Defendant's Motion *in Limine* # 5, Dkt. No. 209 at 2.)  Like the pricing discussions that predated the conspiracy, the pricing discussions concerning products other than canned tuna are admissible against defendant.

### III. Competitor Communications Regarding the "Tuna the Wonderfish" Campaign Are Admissible

Defendant seeks to exclude argument that the Tuna the Wonderfish campaign was unlawful.  As discussed above, the government does not intend to argue that the campaign was in and of itself unlawful.  Moreover, the evidence regarding the existence of the campaign is inextricably intertwined with the charged price-fixing conspiracy, is not unfairly prejudicial, and thus is admissible against defendant.  As explained above, the campaign set the stage for the conspiracy by providing an opportunity for the competitors to meet with each other and build trust in their relationships.  When fish prices also began to rise precipitously at the same time, it became imperative that the companies agree to end the price war and to raise prices to cover these costs.  Reference to the Tuna the Wonderfish campaign is thus necessary for the government to "offer a coherent and comprehensible story regarding the commission of the crime."  *DeGeorge*, 380 F.3d at 1220 (quoting *Vizcarra-Martinez*, 66 F.3d at 1012-13).  Likewise, because defendant directed his employees to raise prices in order to cover the cost of the Tuna the Wonderfish campaign and told his subordinates the other companies would follow through with similar price increases, the campaign was "a part of the transaction that serves as the basis for the criminal charge" and is admissible independent of Rule 404(b).  *Id.* (quoting *Vizcarra-Martinez*, 66 F.3d at 1012).

Even assuming the government could somehow excise evidence of the Tuna the Wonderfish campaign from the price-fixing conspiracy, it would be admissible under Rule 404(b) as evidence of motive to enter into the conspiracy.  *Conners*, 825 F.2d at 1390.  As explained above, witnesses will testify that the Tuna the Wonderfish campaign, among other things, motivated defendant's desire to end the 2010 price war and enter into a "truce" with

U.S. OPP. TO DEFENDANT MILS RE 404(B) EVID.

competitors. Defendant concedes that he participated in the Tuna the Wonderfish campaign and that it occurred simultaneously with the charged price-fixing conspiracy. Thus, the Tuna the Wonderfish campaign evidence is relevant to opportunity and motive, was not too remote in time (since it occurred contemporaneously with the formation of the conspiracy), and sufficient evidence supports a finding that the defendant participated in the other act (defendant does not dispute he participated in the campaign). *See Verduzco*, 373 F.3d at 1027. As such, the evidence is admissible under 404(b) even if it is not inextricably intertwined.[5]

The evidence concerning the Tuna the Wonderfish campaign is also not unfairly prejudicial. The government does not intend to argue that the Tuna the Wonderfish campaign in and of itself constitutes criminal conduct. There is no danger of unfair prejudice and no basis to exclude the evidence under Rule 403. *See United States v. Anderson*, 741 F.3d 938, 950 (9th Cir. 2013) ("Unlike evidence of drug sales, for example, evidence of software sales does not have a strong prejudicial impact because there is nothing inherently wrong with selling software, which is usually sold legally."). Therefore, the evidence is admissible against defendant.

### IV.   Competitor Communications Regarding the Copacking Agreement Are Admissible

Defendant seeks to exclude any argument that the copacking agreement was unlawful. The government does not intend to argue that the copacking agreement was in and of itself unlawful, as discussed above. Like the Tuna the Wonderfish campaign, however, the

---

[5] Defendant's reliance on *In re Citric Acid Litigation*, 996 F.Supp. 951, 959 (N.D. Cal. 1998), for the proposition that "[w]here cooperation is necessary for a legitimate business purpose, the mere opportunity to conspire at business meetings is insufficient to support an inference of conspiracy," is misplaced. *See also Weit v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 641 F.2d 457, 462 (7th Cir. 1981). The court in *In re Citric Acid Litigation* held that civil plaintiffs had failed to produce sufficient evidence indicating that defendant participated in the conspiracy to proceed to trial, not whether particular evidence was admissible at trial. *In re Citric Acid* Litigation, 996 F.Supp. at 962. Here, in contrast, the government is not relying on circumstantial evidence alone. Rather, it has substantial direct evidence of defendant's participation in the price-fixing conspiracy and the evidence defendant seeks to exclude. *See In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2011 WL 7713911 at *1 (N.D. Cal. Nov. 7, 2011) ("This case, however, is a far cry from *Citric Acid* . . . there is ample evidence for a jury to find [defendant participated in the overarching conspiracy to fix prices.]). *In re Citric Acid* and *Weit* are inapposite.

copacking agreement is inextricably intertwined with the charged conspiracy, is not unfairly prejudicial, and is thus admissible against defendant. The copacking agreement between Bumble Bee and COSI—which transpired during the conspiracy—gave defendant an opportunity to further the conspiracy and provided a cover for communications between defendant and Chan. Because of the copacking agreement, collusive pricing discussions were interspersed with other legitimate business discussions, and it would be impossible to offer a "coherent and comprehensible story" regarding the price-fixing conspiracy without referring to the copacking agreement. See *DeGeorge*, 380 F.3d at 1220 (quoting *Vizcarra-Martinez*, 66 F.3d at 1012).

There is no danger of unfair prejudice because the government does not intend to argue that the copacking agreement was nefarious or unlawful by itself.[6] See *Anderson*, 741 F.3d at 950. The fact that the copacking agreement was lawful, however, does not mean that it did not also provide an opportunity for defendant to engage in illicit price discussions with executives at COSI. As such, evidence regarding the copacking agreement is admissible because it is inextricably intertwined with the charged conduct and shows defendant had the opportunity to engage in price discussions in furtherance of the conspiracy.

**V.     Competitor Communications Regarding the Fish-Fill Lawsuit Are Admissible**

Evidence of communications between competitors regarding civil claims filed against each company for under-filling cans of tuna is inextricably intertwined with the charged conspiracy, is not unfairly prejudicial, and is thus admissible against defendant. Reference to discussions concerning the fish-fill lawsuits is necessary for the government to "offer a coherent and comprehensible story regarding the commission of the crime" to the jury. *DeGeorge*, 380 F.3d at 1220 (quoting *Vizcarra-Martinez*, 66 F.3d at 1012-13).

Contrary to defendant's assertion, the fish-fill evidence is not "wholly unrelated" to the charged price-fixing conspiracy. Rather, defendant and his coconspirators conspired to raise prices in response to the increased costs resulting, in part, from the settlements of the fish-fill

---

[6]     The government did not include the copacking agreement in its Rule 404(b) notice in part because it is not a "crime, wrong, or other act" that could be used to prove a person's character and propensity to conform in accordance with that character. Fed. R. Evid. 404(b).

lawsuits. For example, in an internal email titled "Pricing Justification," Steve Hodge of StarKist writes that the "fish fill component" should be built in as a justification for a price increase that the competitors had agreed upon.

Defendant's reliance on *United States v. Lillard*, 354 F.3d 850 (9th Cir. 2003), is misplaced. In *Lillard*, the Ninth Circuit upheld the admission of evidence that the defendant stole a portion of the cocaine he was paid to deliver because the theft was inextricably intertwined with the defendant's charge of conspiracy with intent to distribute. *Id.* at 853-54. Just as the "other act" in *Lillard* constituted "a part of the transaction that serve[d] as the basis for the criminal charge," here defendant and his coconspirators fixed prices in response to the settlements in the fish-fill lawsuits, which increased the companies' costs, cut into profit margins, and motivated defendant and his co-conspirators to fix prices. Accordingly, *Lillard* supports admission of the evidence at issue here.

Likewise, even if not inextricably intertwined, evidence of the fish-fill settlements may be offered to prove defendant's motive. Fed. R. Evid. 404(b). Here, the fish-fill settlements raised the companies' costs for the reasons discussed above. It is, therefore, admissible evidence of defendant's motive to further raise prices as part of the price-fixing conspiracy. *United States v. Feldman*, 788 F.2d 544, 556 (9th Cir. 1986) (finding that evidence of defendant's indebtedness admissible under 404(b) to show motive to commit bank robbery).

There is also no danger of unfair prejudice. As defendant acknowledges, the settlements do not indicate that the companies intentionally underfilled their cans. (Defendant's Motion *in Limine* # 6, Dkt. No. 210 at 1.) Nor does the government intend to admit evidence that defendant was personally involved in the conduct that formed the basis for the civil lawsuits. What matters, however, is that the jury be permitted to hear a coherent story: that increased costs resulting from the settlements was among the factors leading defendant and his co-conspirators to fix the prices of canned tuna.[7]

---

[7] Likewise, defendant's claim that introduction of competitor communications concerning the companies' response to the fish-fill lawsuits through price-fixing will invite a "trial within a trial" is unfounded. (Dkt. No. 210 at 2.) The merits of the various methods for measuring the amount of tuna in a can is irrelevant to this case, and the government does not intend to offer

# CONCLUSION

Evidence related to competitor communications that predated the conspiracy or concerned other products, the Tuna the Wonderfish campaign, the copacking agreement, and the fish-fill settlements is inextricably intertwined with the charged conspiracy and probative of defendant's intent, knowledge, absence of mistake, opportunity, and motive to commit the charged crime. None of the evidence is unfairly prejudicial. For all the foregoing reasons, defendant's Motions *in Limine* # 3, 4, 5, and 6 seeking to exclude evidence under Rule 404(b) should be denied.

Dated: August 13, 2019   Respectfully submitted,

/s/ *Micah L. Rubbo*
MICAH L. RUBBO
LESLIE A. WULFF
MIKAL J. CONDON
ANDREW SCHUPANITZ
Trial Attorneys
U.S. Department of Justice
Antitrust Division

---

evidence in this regard. The government may introduce evidence regarding the existence of the underfilling lawsuits and the rising costs that accompanied the settlements. The settlements—not the underlying underfilling claims—motivated the price fixing.

U.S. OPP. TO DEFENDANT MILS RE 404(B) EVID.
No. 18-cr-00203-EMC                           16