KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - # 158708
epeters@keker.com
CHRISTOPHER C. KEARNEY - # 154101
ckearney@keker.com
ELIZABETH K. MCCLOSKEY - # 268184
emccloskey@keker.com
NICHOLAS S. GOLDBERG - # 273614
ngoldberg@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     415 391 5400
Facsimile:     415 397 7188

Attorneys for Defendant
CHRISTOPHER LISCHEWSKI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER LISCHEWSKI,<br><br>Defendant. | Case No. 3:18-cr-00203-EMC<br><br>**DEFENDANT'S MOTION TO EXCLUDE EVIDENCE AND ARGUMENT RELATING TO "FAD-FREE" FISHING**<br><br>Date:     October 1, 2019<br>Time:    9:30 a.m.<br>Dept.    Courtroom 5 – 17th Floor<br>Judge:  Hon. Edward M. Chen<br><br>Date Filed: May 16, 2018<br><br>Trial Date: November 4, 2019 |

## I.  INTRODUCTION

At the Court's invitation, defendant Christopher Lischewski hereby moves, pursuant to Federal Rule of Evidence 403, to exclude evidence and argument relating to an alleged agreement not to offer products based on fishing gear or methods—in particular, tuna labeled "FAD-free."[1]

As the Court rightly observed in response to the government's offer of proof on this topic, the government's evidence does "not appear to be probative of the alleged price fixing conspiracy," and the Court did "not see a nexus between the offer of proof" and the alleged price-fixing conspiracy.  Dkt. No. 310 at 2.  "Even if offered as circumstantial evidence (*e.g.*, to show a desire to maximize profits generally), there is a very weak inference that the FAD-free agreement is probative of a method or means of furthering the alleged conspiracy to fix canned tuna prices." *Id.*  At most, the government's evidence suggests a "general desire to maximize profits, a perception that American consumers were unwilling to pay a higher price for FAD-free products, and an understanding that Bumble Bee, Starkist and Chicken of the Sea wanted to present a unified voice against Greenpeace's campaign.  Weighed against the absence of any real probative value," is the Court's well-founded "concern that such evidence would create an unnecessary sideshow and confusion for the jury regarding a collateral issue.  It would likely lead to conflicting and extensive evidence as to the motives of the parties regarding the FAD free decision." *Id.* at 3.  Accordingly, and to "assure a fair process," the Court invited this motion. *Id.*

As demonstrated below, this Court's inclination to exclude such evidence, as expressed at the September 4, 2019 hearing and in the Court's subsequent minute order, is correct. *See id.* at 2–3; Dkt. No. 307 at 12:20–36:11.  Evidence relating to the alleged FAD-free agreement is not probative of a price-fixing conspiracy, and any probative value is substantially outweighed by the dangers of a prejudicial, confusing, misleading and time-consuming sideshow about FAD-free labeling, which is a collateral issue at most.  The Court, therefore, should exclude evidence and argument relating to the alleged agreement not to offer products based on fishing gear or methods, including "FAD-free" methods.

---

[1] A "Fish Aggregating Device," or "FAD," is a floating object that attracts fish.

## II.     ARGUMENT

As the Court is well aware, even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

For example, in *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369 (9th Cir. 1989), the Ninth Circuit upheld the district court's exclusion of evidence of the defendant's allegedly anticompetitive conduct because it "was only ambiguously anticompetitive." *Id.* at 1380. Furthermore, although the plaintiff argued that the evidence in question was probative of the conduct element of its attempted-monopolization claim, the central issue in the case was whether the defendant had engaged in predatory pricing, and the plaintiff "would have been required to establish its predatory pricing allegations" in any event. *Id.* "But a showing of predatory pricing would have established the conduct element as well. Thus, the evidence held inadmissible was somewhat cumulative and only modestly probative of the conduct needed for attempted monopolization. On the other side of the Rule 403 equation, however, the evidence held inadmissible threatened to confuse the issues or mislead the jury." *Id.* In particular, the jury could have been "strongly influenced" by evidence of the defendant's "aggressive behavior," even though that behavior did not support an inference of intent to monopolize. *Id.* "The district court could reasonably decide that this danger of improper influence on the intent element substantially outweighed" the plaintiff's "less-than-compelling need for introduction of the evidence on the conduct element. Consequently, the exclusion of the evidence was not an abuse of discretion." *Id.*

Similarly, in *Weit v. Continental Illinois National Bank & Trust Co. of Chicago*, 641 F.2d 457 (7th Cir. 1981)—on which the Ninth Circuit relied in *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 527 (9th Cir. 1987)—the court affirmed the exclusion, under Rule 403, of evidence relating to lobbying efforts regarding interest rates that could be charged on credit cards. The court acknowledged that "an inference can be drawn that the banks would not have worked together in lobbying for passage of a bill in the legislature unless they had implicitly

1  agreed on an interest rate as well," which would be price fixing. *Weit*, 641 F.2d at 466. "While
2  an inference of a separate agreement to fix consumer credit rates could be drawn from this
3  evidence, the more direct link is to the defendants' legislative efforts which *Noerr-Pennington*
4  immunizes from anti-trust liability." *Id.* at 467. Although the district court might have instructed
5  the jury against imposing liability based on lobbying activity, even so, "confusion of issues is the
6  probable result of admission of this evidence," and the district court correctly excluded it under
7  Rule 403. *Id.*

8  Here, as the Court has recognized, introduction of evidence about FAD-free tuna "would
9  create an unnecessary sideshow and confusion for the jury regarding a collateral issue." Dkt.
10 No. 310 at 3. In response to the government's attempt to prove that Mr. Lischewski resisted
11 "FAD-free" labeling as a purported means of advancing the alleged price-fixing conspiracy, Mr.
12 Lischewski must be allowed to explain and prove that his resistance to the Greenpeace-led "Anti-
13 FAD" campaign was based on his sincere and well-founded belief that Greenpeace's campaign
14 was misguided and counterproductive, and that "FAD-free" labeling would be misleading and
15 harmful to competition. Indeed, the government admits that, "Yes, the Defense will be entitled to
16 present some evidence of the reasons why of [sic] Mr. Lischewski believed [that], and you know
17 what? They are allowed to do that." Dkt. No. 307 at 29:20-22.

18 As the Court rightly indicated, moreover, it will not just be "some evidence," *id.*, but
19 "extensive evidence," Dkt. No. 310 at 3. The parties "could spend days in front of the jury just
20 debating, you know, the pros and cons and we get into the whole debate about Greenpeace and
21 everything else all for something that has such tiny probative value." Dkt. No. 307 at 17:15-20.
22 This is a "403 problem," *id.*, and the solution is to exclude the evidence. *See, e.g., Tennison v.
23 Circus Circus Enters., Inc.*, 244 F.3d 684, 690 (9th Cir. 2001) (affirming exclusion of evidence
24 that "might have resulted in a 'mini trial,' considering that much of [it] was disputed by
25 Defendants," and resolving those disputes "would be an inefficient allocation of trial time"); *In re
26 Cathode Ray Tube Antitrust Litig.*, No. C-07-5944 JST, 2016 WL 7803893, at *2 (N.D. Cal. Nov.
27 15, 2016) ("One function of Rule 403 is to avoid the introduction of large quantities of extrinsic
28 evidence to create mini-trials regarding tangentially related matters.") (quotation marks omitted).

Furthermore, as in *Thurman*, the government's FAD-related evidence, even if probative, will be cumulative at best because the government can only prevail by proving price fixing by more direct evidence. *See Thurman*, 875 F.2d at 1380. If the government can prove price fixing—which it cannot—a mini-trial about FAD-free labels will simply be a waste of time. And if the defense is right that the government cannot prove price fixing, yet the jury returns a guilty verdict, then the danger that concerned the court in *Weit* will be manifest: the jury will have found liability based on lawful activity. *See Weit*, 641 F.2d at 466–67. Either way, the risks substantially outweigh the probative value of the FAD-related evidence, if any.

The government's September 3, 2019 offer of proof only confirms that its FAD-related evidence should be excluded.[2] For example, the government quotes selectively from Shue Wing Chan's deposition transcript, but if the government were allowed to present such evidence at trial in the manner its proffer suggests, it would be "misleading the jury." Fed. R. Evid. 403. Mr. Chan's testimony does not support any inference that the alleged agreement not to market "FAD-free" tuna furthered the alleged price-fixing conspiracy. Instead, Mr. Chan testified that the suggestion that "FAD-free is better" is "not something that the industry agree[s] with." Ex. 2472 at 264:18-19. Resisting labels that industry leaders believe to be misleading does not further a price-fixing conspiracy, it is simply what the law requires. *See* 15 U.S.C. § 45; 16 C.F.R. § 260.1 *et seq*. Mr. Chan also testified that if industry leaders had switched "from FAD to FAD-free, there is not enough [FAD-free] fish in the market," which would create artificial scarcity in pursuit of a supposed environmental benefit that consumers—like the industry leaders themselves—do not see as an actual benefit. Ex. 2472 at 312:11–314:11; *see also id.* at 264:23–265:5 (same). That has nothing to do with price fixing, as the Court rightly noted. *See* Dkt.

---

[2] The Court has noted that any "additional evidence" the government may offer in connection with its September 20, 2019 response to this motion will "be received with skepticism if it is inconsistent with the documents and witness statements already in the Government's possession." Dkt. No. 310 at 3. Mr. Lischewski reserves the right to object or otherwise respond to any "additional evidence" the government may offer, including by demonstrating that such evidence is inconsistent with the government's September 3, 2019 proffer, and/or that the government could and should have included its "additional evidence" in that proffer.

No. 307 at 23:10-13 (stating that Mr. Chan's testimony about the alleged FAD-free agreement "doesn't tie it back to the price-fixing conspiracy").

Nor do the government's proffered trial exhibits support its argument that the decision not to label products as "FAD-free" had anything to do with price fixing. For example, the government cites Exhibit 212, but that email makes clear that the FAD-free issue only came about due to "Greenpeace['s] push," and Mr. Lischewski and others disagreed with Greenpeace's position because it was not supported by science or practice, as it is "practically IMPOSSIBLE to separate School from FAD caught" fish, and "even more difficult to maintain segregation during unloading and transshipping." Similarly, Exhibit 266 merely explains Bumble Bee's position that "identification of gear type" does not provide "value to consumers and has the greater risk of creating unwarranted confusion and concern." Exhibit 2183 also details Bumble Bee's reasons for pushing back against Greenpeace's position, which was "not supported by science" and would cause customer confusion. Finally, there is no evidence supporting the government's contention that "FAD-free" tuna would have been a "lower-margin product." DOJ Proffer at 1. On the contrary, "FAD-free" tuna would have been a premium product and the costs of producing it (to the extent "FAD-free" claims could even be verified[3]) would have been passed on to consumers, as the government's own cited evidence demonstrates. *See* Ex. 268 (February 13, 2012 email explaining that Safeway's "non-FAD" private label product would "result in higher pricing");

---

[3] When industry leaders were discussing how to address Greenpeace's "Anti-FAD" campaign, there was no verified source of "FAD-free" tuna on the market. *See* Ex. 2183. Indeed, there was not even an accepted definition of what constitutes a FAD. Does it include floating logs, patches of seaweed, dead whales, and other naturally-occurring debris? Does it have to be a man-made device specifically deployed to facilitate purse-seine fishing? These and other such questions were the subjects of active review and discussion at the time. And however FADs are defined, there was no agreed upon or approved method to validate or certify FAD-free fish at the relevant time. Without a certification or observer program (human or electronic), it would be impossible to certify that fish was actually FAD-free. A fishing trip is generally 45 to 60 days, during which the vessel will catch between 1,000 and 1,500 tons of tuna, one net-full at a time, each of these "sets" containing between 10 and 300 tons of tuna. The tuna is brought on board and placed into "wells"—tanks of refrigerated sea water—each of which holds about 50 to 70 tons of fish. Without trained and independent observers or electronic surveillance equipment on board, there is no way to verify that fish placed into these wells is FAD-free. In many cases, fish is intermingled from one set to another to fill one well before starting another. So even if Bumble Bee had agreed to put "FAD-free" on its labels, it would have had no way to certify that the tuna was actually FAD-free other than by taking the word of the fishermen, and one can only imagine the damage to the brand if tuna labeled "FAD-free" was later found to have been caught on FADs.

Ex. 2183 at 3 ("Independent research suggests that only a small percentage of mainstream consumers are willing to pay more for" supposedly environmentally friendly products).  While these exhibits clearly show that Mr. Lischewski and others genuinely disagreed with Greenpeace's position on the use of FADs, they do ***not*** show any conspiracy to fix prices.

### III.     CONCLUSION

For the foregoing reasons, as well as those already identified by this Court, the Court should exclude evidence and argument relating to the alleged agreement not to offer products based on fishing gear or methods, including "FAD-free" methods.

Dated:  September 13, 2019                                   KEKER, VAN NEST & PETERS LLP

By:     */s/ Elliot R. Peters*

ELLIOT R. PETERS
CHRISTOPHER C. KEARNEY
ELIZABETH K. MCCLOSKEY
NICHOLAS S. GOLDBERG

Attorneys for Defendant
CHRISTOPHER LISCHEWSKI