UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

# CRIMINAL MINUTES

**Date:** October 18, 2019 **Time:** 10:02 – 12:28 = 2 Hours; 26 Minutes **Judge:** EDWARD M. CHEN

**Case No.**: 18-cr-00203-EMC-1 **Case Name:** United States v. Christopher Lischewski

**Attorneys for Government:** Manish Kumar, Leslie Wulff, Mikal Condon, Andrew Mast, Andrew Shupanitz
**Attorneys for Defendant:** Elliot Peters, Nicholas Goldberg, Elizabeth McCloskey, Christopher Kearny, Katie Joyce
**Defendant:** [X] Present [ ] Not Present
**Defendant's Custodial Status:** [ ] In Custody [X] Not in Custody

**Deputy Clerk:** Angella Meuleman **Court Reporter:** JoAnn Bryce
**Interpreter:** **Probation Officer:**

## PROCEEDINGS

1. Final Pretrial Conference;
2. [398] MOTION in Limine *to Admit Government Trial Exhibit 855*
3. [353] MOTION to Exclude *Testimony of Defendant's Economic Expert Witness*

## SUMMARY

Parties stated appearances and proffered argument.

### Permissible Research of Potential Jurors

Defendant indicated he intends to conduct research limited to information that is publicly available about potential jurors—*e.g.*, information that would appear on a typical Google search. The Government proposed a complete ban on researching potential jurors but expressed openness to limited research. The Court found Local Rule 47.2 from the U.S. District Court of Idaho to be a reasonable approach; it reads:

> (a) Attorneys may use websites available to the public, including social media websites, for juror or prospective juror research, so long as:

(1) The website or information is available and accessible to the public;

(2) The attorney does not send an access request to a juror's electronic social media;

(3) No direct communication or contact occurs between the attorney and a juror or prospective juror as a result of the research, including, but not limited to Facebook "friend" requests, Twitter or Instagram "follow" requests, LinkedIn "connection" requests, or other forms of internet and social media contact;

(4) Social media research is done anonymously. For example, a search on a social media site must not disclose to the juror who is making the inquiry, and it must only seek information available and accessible to the public and not the result of an attorney's account on said social media site; and

(5) Deception is not used to gain access to any website or to obtain any information.

(b) Third parties working for the benefit of or on behalf of any attorney must comply with all the same restrictions as set forth above for attorneys . . . .

(d) If an attorney becomes aware of a juror's posting on the internet about the case in which she or he is serving, the attorney shall report the posting to the Court.

The foregoing rule is adopted for this trial. Counsel shall not do any internet or social media research that requires entering or logging in the identification of the inquirer.

**Sequestration of Witnesses And Their Counsel**

Defendant requested the Court order all witnesses (other than Mr. Lischewski) excluded from the courtroom under FRE 615 to prevent witnesses from learning about other witnesses' testimony. Defendant further requested the Court admonish counsel for government-cooperating witnesses from revealing to their clients or other witnesses the substance of the trial proceedings, which includes refraining from reading the trial transcripts. The Government joined Defendant's request to exclude witnesses under FRE 615. But the Government did not believe the exclusion

of counsel is necessary. The Government believed there is some utility for counsel staying in the courtroom because the Court will rule on exhibits, etc., during trial.

The parties' request to exclude witnesses from the courtroom pursuant to FRE 615 is **GRANTED**. As there is no need to have counsel for witnesses present or read the transcript, FRE 615 will extend to their counsel as well.

**Defendant's Objections to Exhibits Re Defendant's Financial Circumstances**

The parties reached a limited stipulation regarding Defendant's base compensation, bonus structure, and ownership percentage of Bumble Bee in 2011, 2012, and 2013. However, the parties could not stipulate to the value of Defendant's 4.1% common stock ownership stake in Bumble Bee nor to a description of the potential benefits of Bumble Bee's financial performance. As such, the Court was required to rule on the admissibility of Trial Exs. 324–28 and testimony from Jefferey Chang of Lion Capital.

Defendant continued to object to the admissibility of these exhibits because of the minimal probative value and the likelihood of confusion for the jury, which would derive from explanation of hypothetical scenarios regarding a sale involving a variety of assumptions. The Government renewed its request to admit Trial Ex. 324 and limited pages of 325. As previously noted, the value of the incentives perceived by Defendant, whether eventuated or not, is probative to his state of mind and motive.

Defendant's objections are **OVERRULED in part and SUSTAINED in part**. There is enough probative value in Trial Ex. 324 for it to come in because it is an e-mail from Defendant, which demonstrates his expectations and state of mind. The limited pages in Trial Ex. 325, bearing bates nos. LION-X-000000235–37, are also admitted to show how much stock (and what kind, *i.e.*, type of classification) Defendant owned. Jeffrey Chang will be allowed to testify to and introduce these exhibits. Defendant may cross-examine Mr. Chang.

Trial Exs. 326, 327, and 328 are excluded.

**Attorney Proffer Notes**

The Government sought guidance as to how the Court will rule on whether paralegal notes constitute a statement within the meaning of FRE 613(b). It requested that the Court preclude Defendant from introducing the notes during cross-examination and, instead, allow Defendant to introduce them in his case-in-chief, if the Court so finds that the notes contain substantially verbatim statements. According to the Government, this approach would avoid jury confusion.

This procedure is not consistent with FRE 613(b), which states "[e]xtrinsic evidence of a witness's prior inconsistent statement is admissible ***only if the witness is given an opportunity to explain or deny the statement*** and an adverse party is given an opportunity to examine the witness about it . . . ." (emphasis added). If the impeachment evidence comes in, it will come in

as any other piece of extrinsic impeachment evidence. That is, the adverse party will be given an opportunity to examine the witness about the prior statement during cross-examination so he or she can have an opportunity to explain; then, if it is necessary for the adverse party to introduce the putative prior inconsistent statement for impeachment, the Court will so rule on whether the notes contain the witness's statement. When ruling, the Court will consider whether the statement can be deemed that of the witness. That resolution will turn in part upon the precise question(s) put to the witness.

**Summary Charts**

Defendant disclosed ninety-one (91) summary charts with his expert-witness disclosure. The Government is in the process of reviewing those charts. It represented it is less than halfway through its review for accuracy and estimated it needs until 10/25/19 to complete its review. Government shall notify Defendant of any disputes by **10/25/19**. The Government represented it has found no discrepancies to date. The Government also indicated it intends to submit rebuttal summary charts. It must do so by **10/30/19**.

Relatedly, the parties discussed their desire to utilize demonstrative exhibits during their respective opening arguments. The Court has no policy prohibiting such usage, so long as the parties stipulate and there is no risk related to the exhibits' admissibility and/or accuracy.

Parties must exchange the charts/exhibits they intend to use for opening statement by **10/23/19**. If any issues arise out of such exchange, parties can address them with the Court on **10/25/19**.

**Third-Party Exhibit Redactions**

The Government explained the limited redactions made on its documents. There are twelve exhibits containing third-party redactions. Defendant argued he is entitled to review the information beneath the redactions because it may contain exculpatory evidence. Aside from redaction in Trial Ex. 706, he has not identified any reason specific to these documents to suspect that the at-issue exhibits contain exculpatory evidence. The Government argued that all twelve of these exhibits are from Bumble Bee or Lion Capital, to which Defendant, at one time, had access in un-redacted form. The Government further maintained that Defendant has not made a showing to question the good-faith assertion of privilege or the accuracy of the accompanying privilege log, and Bumble Bee's plea agreement does not waive its privilege.

The parties are ordered to submit briefing on the following issues: (1) the threshold showing one must make to overcome privilege (the basis for the redaction); (2) the specific factual showings which would justify waiver of privilege for each of the twelve exhibits (Defendant must append the twelve exhibits to his brief), and (3) the procedure the Court should follow to effectuate un-redacting an exhibit controlled by a third party. Briefs are due on **10/22/19 at 10:00 AM**.

**<u>Defendant's Objection to Trial Ex. 855 (Adopted Admission)</u>**

The Court had deferred ruling on Defendant's objection to Trial Exhibit 855, which is an e-mail in which Defendant circulated his Wall Street Journal interview internally to Bumble Bee's executive committee (a/k/a Bumble Bee's leadership team). Defendant argued it is inadmissible hearsay under FRE 801(c). The Government argued Defendant's act of forwarding the e-mail constituted an adopted admission under FRE 801(d)(2)(B). The Court invited supplemental briefing.

Both parties cited to *Sea-Land Serv., Inc. v. Lozen Int'l, LLC.*, 285 F.3d 808, 821 (9th Cir. 2002). In *Sea-Land*, the Ninth Circuit held that a company adopted a statement when an employee of the company adopted another employee's e-mail by copying the entire body of the latter employee's e-mail into her own e-mail and prefaced it with "Yikes, Pls note the rail screwed us up . . . ." *Id*. at 821. The Government argued that Defendant's conduct in forwarding the WSJ interview fits squarely within the conduct that the Ninth Circuit found to be non-hearsay, *i.e.*, forwarding a statement via e-mail. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 973 (C.D. Cal. 2006) (citing *Sea-Land*, 285 F.3d at 821) ("If content created by individuals other than the creator of an e-mail is incorporated into the e-mail, the incorporated content is also admissible non-hearsay under Rule 801(d)(2).).

Defendant's attempt to distinguish *Sea-Land* is not persuasive. He argued that "[u]nlike *Sea-Land*, Mr. Lischewski did not copy the Wall Street Journal—he merely forwarded it—and nothing in the text of his e-mail demonstrated that Mr. Lischewski had any knowledge of the article's contents, let alone 'manifested an adoption or belief in [the] truth of the information contained in the' article." Docket No. 395. The argument is not persuasive. The distinction between forwarding an article (about the email author himself) versus copying and pasting an article into an e-mail is not enough to distinguish Trial Ex. 855 from *Sea-Land*. Defendant implicitly endorsed the article.

Defendant also cited to *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991) as authority that held reversible error for the admission of alleged party-opponent statements contained within newspaper articles. Docket No. 395. In *Larez*, however, the Ninth Circuit was not confronted with an adopted-admission issue. There, a defendant police officer participated in an interview with a newspaper reporter outside of the courthouse and made incriminating statements. *Larez*, 946 F.2d at 641. The newspaper subsequently published defendant's statements in quotations that corroborated with his oral interview statements. *Id*. The Ninth Circuit concluded that defendant's "actual out-of-court statements pose no admissibility problem . . . ¶ The statements' repetition in the newspaper, however, posed a more difficult problem which the district court failed to address. As the reporters never testified nor were subject to cross-examination, their transcriptions of [defendant's] statements involve a serious hearsay problem." *Id*. Unlike here, there was no further publication from or by the defendant in *Larez* to third parties and, therefore, no adopted-admission issue.

Because *Sea-Land* applies—and *Larez* does not—Defendant's objection to Trial Ex. 855 is **OVERRULED**.

**Defendant's Objection to The Government's Second Amended Notice of Coconspirator Statements**

The Government amended its notice of coconspirator statements to include two additional statements from Stephen Hodge: (1) conversations with Tuza following industry events that Tuza attended with Defendant, after which Tuza and Defendant would talk about pricing at their respective companies, including push back regarding aggressive pricing; and (2) conversations with Worsham wherein Worsham would indicate that he would need to "cover" a pricing action with Defendant.

As to item no. (1), the Government included the requisite specificity to lead a jury to find the communication was in furtherance of a conspiracy. Defendant's objection to item no. (1) is **OVERRULED**.

Regarding item no. (2), the term "cover" lacks specificity and is amorphous. Because this is the second time the Government amended its notice of coconspirator statements, the Court requested an offer of proof. The Government represented that Mr. Hodge will tie the conversation to collusion with regard to the Q3 guidance pricing; specifically, that Hodge and Worsham reached a pricing agreement, and Worsham would say from time to time that he needed approval from Defendant in order to implement the agreed price.

Defendant objected on the grounds that the Government's representation was inconsistent with the representation at the last hearing, wherein it explained that the conversation between Hodge and Worsham was not about a price-fixing agreement.

Defendant is ordered to submit a transcript citation illustrating the Government's inconsistent representation(s) by **10/22/19 at 10:00 AM**. If the Court is not persuaded by the showing of inconsistency, it will reserve ruling on item no. (2) until it has heard the foundation needed to tie the testimony to an 801(d)(2)(E) ruling.

**Defendant's Renewed Motion to Compel Material**

The Court previously denied Defendant's request to compel compliance with *Brady*, *Giglio*, the Jencks Act, and Federal Rule of Criminal Procedure 16. *See* Docket No. 176. Defendant renewed his motion based on the Government's recent disclosure of notes concerning an interview with Kenneth Worsham's counsel regarding Robert Worsham. Specifically, Defendant requested all dates of meetings and phone calls with cooperating witnesses, and names of people whom the Government charged and/or did not charge but claims are coconspirators.

The Government represented that it has fully complied with its obligations after multiple reviews of its materials. Defendant's renewed motion to compel is **DENIED**.

**Use of Defendant's Photograph**

The parties disputed what photo of Defendant to display for the jury. The parties are ordered to resolve this dispute without the Court's assistance. Court's preference is for a more recent photo.

**THE GOVERNMENT'S *DAUBERT* MOTION**

**Introduction**

The Court previously ordered Defendant to provide a supplemental disclosure regarding his anticipated economic expert witness, Professor James Levinsohn, PhD., by September 27, 2019, so the Government could prepare its *Daubert* motion. Docket No. 309. After Defendant's disclosure, the Government filed its motion arguing to exclude Professor Levinsohn's expert testimony on four grounds: (1) Professor Levinsohn's opinions are inadmissible justification-and-effects testimony, which the Court precluded in the Government's motion in limine no. 1; (2) Professor Levinsohn's opinions are unreliable and unverifiable; (3) Professor Levinsohn offers inappropriate testimony for an expert economist; and (4) Professor Levinsohn's testimony has little probative value and would confuse the jury under FRE 403. Docket No. 353 ("Mot.").

**Legal standard**

Federal Rule of Evidence 702 allows a qualified expert to testify "in the form of an opinion or otherwise" where: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The proponent of the expert testimony has the burden of proving the proposed testimony is admissible. *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

To be admissible under Rule 702 expert testimony must be relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). "[R]elevance means that the evidence will assist the trier of fact to understand or determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007); *see also Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("The requirement that the opinion testimony assist the trier of fact goes primarily to relevance.") (internal quotation marks omitted).

Under the reliability requirement, the expert testimony must "ha[ve] a reliable basis in the knowledge and experience of the relevant discipline." *Primiano*, 598 F.3d at 565. To ensure reliability, the court must "assess the [expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance." *Id.* "Although the district court must perform a gatekeeping function, a trial court 'not only has

broad latitude in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability.'" *United States v. Gadson*, 763 F.3d 1189, 1202 (9th Cir. 2014) (citation omitted); *see also Daubert*, 509 U.S. at 597. "When evaluating specialized or technical expert opinion testimony, the relevant reliability concerns may focus upon personal knowledge or experience." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006).

The Ninth Circuit has placed great emphasis on *Daubert's* admonition that a district court should conduct this analysis "with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharmaceuticals Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) (quoting *Daubert*, 509 U.S. at 588). Accordingly, the Ninth Circuit has emphasized that the gatekeeping function is meant to "screen the jury from unreliable nonsense opinions, but not to exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). That is because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see, e.g.*, *Murray v. Southern Route Maritime SA*, 870 F.3d 915, 925 (9th Cir. 2017); *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017).

**<u>Discussion</u>**

Defendant's expert-witness disclosure describes Professor Levinsohn's qualifications and credentials as follows:

> Professor Levinsohn is an expert in antitrust, industrial organization, and econometrics. He has provided expert reports and testimony in many antitrust and regulatory matters and has also consulted to numerous government entities and international organizations. Professor Levinsohn conducts research in applied econometrics, international economics, and development economics. He has served on the editorial boards of the American Economic Review, and Review of Economics and Statistics, the Journal of International Economics, and the Journal of Economic Literature. Professor Levinsohn is the Charles W. Goodyear Professor in Global Affairs at Yale's Jackson Institute for Global Affairs and Professor of Economics and Management at the Yale School of Management.

*See* Defendant's Second Supplemental Disclosure of Expert Witness ("Expert Disclosure"), at 1. Defendant anticipates Professor Levinsohn to testify about the following eight opinions:

1. In markets with small numbers of competitors and similar products (including the market for canned tuna), economic theory predicts that competitors will take similar pricing action independently ("Opinion 1");

2. The tuna industry has attributes that make it difficult to fix net prices ("Opinion 2");

3. List prices in the market for canned tuna are of minimal significance ("Opinion 3");

4. The net prices charged by Bumble Bee are closely related to Bumble Bee's costs ("Opinion 4");

5. The net prices the tuna companies charged their customers are consistent with competitive activity ("Opinion 5");

6. The data available to Mr. Lischewski was consistent with competition ("Opinion 6");

7. Bumble Bee's, COSI's, and StarKist's margins were lower during the period of the alleged conspiracy ("Opinion 7"); and

8. Economic data is inconsistent with the Government's theory that Mr. Lischewki's e-mails to competitors were a means of enforcing a price-fixing agreement ("Opinion 8").

The Government accused Professor Levinsohn's conclusions as being unreliable, *i.e.*, that they lack any methodology to test reliability. Mot. at 9. Regarding Professor Levinsohn's opinions, Defendant only disclosed, "(1) the data reviewed and (2) that the conclusion reached is based on Professor Levinsohn's 'training, experience, research, studies and review of relevant economic materials.'" *Id*. at 10. Defendant responded that Professor Levinsohn's opinions are based on the following:

> (1) the exhaustive set of all transactional data produced by each tuna company during the relevant period that contains pricing details concerning each of the companies thousands of transactions with their customers; (2) IRI data that captures the total number of cans sold, the average retail price per can, and percentage of cans sold on promotion for all three tuna companies across all retailers during the relevant period; (3) copies of formal promotional guidance issued by the tuna companies during the charged conspiracy, and (4) each relevant list price announcement.

Opp. at 13. According to Defendant, "[e]ach of Professor Levinsohn's opinions is supported by specifically identified summary charts and each of those charts contain similarly detailed, replicable methodologies." *Id*. at 14.

At the hearing, Defendant represented he intended to call Professor Levinsohn for two purposes: (1) as a summery witness to explain the summary charts; and (2) as an expert witness to opine on the summary charts. The summary charts contain methodologies for their conclusions—but Professor Levinsohn's opinions about the summary charts do not. Under *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995), "experts must explain precisely how they

went about reaching their conclusions and point to some objective source . . . to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." In Defendant's Expert Disclosure, after each of Professor Levinsohn's opinions, he simply states that "[t]he bases and reasons for Professor Levinsohn's opinions are his training, experience, research, studies and research of relevant economic materials included on the Joint Exhibit List and Defendant's Supplemental Exhibit List (see Appendix A), which contain, among other things, list price announcements, quarterly guidance, transactional data, IRI/Nielsen data, executive committee meeting materials, board of director presentations . . . ." *See* Expert Disclosure, at 1–5.

This is not a description of methodology. Where Defendant has failed to disclose Professor Levinsohn's methodology for his conclusions, his testimony will be limited. *Daubert*, 43 F.3d at 1319. The Government's *Daubert* motion is **GRANTED in part and DENIED in part** as to Professor Levinsohn's expert-opinion testimony.

The Court ruled more specifically as follows:

**<u>Opinion 1</u>**

Whether competitors in small markets with few competitors—like the canned-tuna industry—will take similar pricing actions independently is relevant and admissible if the summary charts so demonstrate. He can give examples of similarly structured markets. However, to the extent that Professor Levinsohn attempts to offer expert-opinion testimony that "economic theory predicts" such independent actions, that testimony is barred for lack of methodology, *i.e.*, Defendant presented no basis for this generalized theory. **GRANTED in part and DENIED in part**.

**<u>Opinion 2</u>**

Defendant represented Professor Levinsohn will testify the data from the summary charts show lack of consistency and a variation in prices, which are indicative of competition. Professor Levinsohn may testify about the summary charts, but the Government will have an opportunity to cross-examine Professor Levinsohn to challenge the weight of his testimony summarizing the charts. However, Professor Levinsohn may not opine that the charts show a pattern consistent with competition. He has not articulated any methodology by which one can determine what degree of price variation is inconsistent with competition. He offers no, e.g., quantitative or specific analytical framework beyond his own conclusory opinion.

At the hearing, the Government argued that it must be allowed to introduce corporate guilty pleas when examining Professor Levinsohn because his testimony would open the door to the negative inference the Court sought to preclude. Given the Court's limitation in Professor Levinsohn's testimony, said evidence is not necessary. The risks of prejudice far outweighs the probative value. The Government's *Daubert* challenge to Opinion 2 is **DENIED in part and GRANTED in part**.

**Opinion 3**

Professor Levinsohn intends to testify that list prices in the canned-tuna market are of minimal significance because 99% of products are sold below list price, as the summary charts allegedly demonstrate. The Government responded that this data is impermissible to show Defendant's state of mind.

To the extent the summary data show list prices are less significant compared to net products, it is relevant because data of higher significance are more likely to reach the CEO of a company. Professor Levinsohn can testify for this limited purpose; he cannot testify about Defendant's state of mind—*e.g.*, what Defendant knew or likely knew. **GRANTED in part and DENIED in part**.

**Opinion 4**

Professor Levinsohn intends to testify that Bumble Bee's prices are closely related to costs. The Government argued an expert witness is not needed to explain this concept from the summary charts. Defendant responded that Professor Levinsohn is an expert and a teacher, and he will explain the charts and what they mean because they are comprised of complicated and voluminous data. The Government has not identified any prejudice in allowing Professor Levinsohn explain the data. The Government's motion to exclude Opinion 4 is **DENIED**.

**Opinion 5**

Professor Levinsohn intends to testify net tuna prices are consistent with competitive activity. The data illustrating net price that the tuna companies charged their customers are probative: Professor Levinsohn may testify to what the summary charts demonstrate in this regard. However, to the extent his testimony includes whether the data of net prices charged were "consistent" or "inconsistent" with competitive activity or collusion, such testimony is not supported by any analysis or methodology and is excluded under FRE 702. Again, Professor Levinsohn does not explain how to differentiate between net pricing that is consistent or inconsistent with competitive activity. **GRANTED in part and DENIED in part**.

**Opinions 6 and 8**

Professor Levinsohn cannot testify that the data available to Defendant were consistent with competition or that the economic data showed no changes after a "jab." Two reasons bar such testimony: First, as previously discussed, any intent to opine about consistency or inconsistency vis-a-vis competition or collusion is problematic under FRE 702, absent a reliable, replicable methodology; here, there is no articulation of any methodology.

Second, an economics expert is not needed to show the data available to Defendant or the fluctuation in data (if any) before or after a "jab." More importantly with regard to data available

to Defendant, Professor Levinsohn's expertise offers nothing in determining what documents Defendant actually saw. Moreover, to the extent Professor Levinsohn is trying to demonstrate Defendant's knowledge of facts showing competition, Dr. Levinsohn's opinion is of limited value since the issue is Defendant's perception; but Defendant is not a Ph.D. in economics, so data that Defendant viewed would likely be perceived and interpreted differently than how Professor Levinsohn would view the same data with his expertise in economics. Nor is Professor Levinsohn's expertise of value in determining whether prices changed in response to a job.

The Government's motion to exclude Opinions 6 and 8 is **GRANTED**.

**<u>Opinion 7</u>**

Whether the three tuna brands had lower margins during the alleged conspiracy is probative and relevant to the existence of such conspiracy. While the ineffectiveness of an alleged conspiracy is not a defense, economic evidence that explains the pricing behavior for another reason is admissible under *Continental Baking Co. v. United States*, 281 F.2d 137, 145 (6th Cir. 1960):

> . . . explanatory economic evidence offered by defendants can be considered only in relation to their defense, that the price changes were not the result of any agreements. If the jury should find beyond a reasonable doubt that the defendants did enter into price-fixing agreements, as the Government contends, then the defendants are guilty and the explanatory evidence is not available to justify or excuse their conduct, for price-fixing agreements are illegal *per se* no matter what factors influence the parties to enter into them. If, on the other hand, the jury should find that the changes in prices resulted from these other factors, and were not the result of agreements entered into by the defendants, then the defendants are not guilty.

*Id*. at 146. Under *Continental Baking*, this Court ruled that it would permit Defendant to introduce explanatory economic evidence in relation to his defense that there was no illegal agreement. Professor Levinsohn's anticipated testimony about low margins during the charged conspiracy period may be relevant to disprove the existence of an agreement to fix prices. The Government's motion to exclude Opinion 7 is **DENIED**. Professor Levinsohn may not opine on whether those margins are indicative of competition rather than collusion. There are a multitude of factors that can affect margins, including costs outside the control of alleged conspirators. Professor Levinsohn offers no methodology in this regard.

CASE CONTINUED TO: **Monday, October 21, 2019 at 10:30 AM for Jury Instructions. Defendant's appearance is waived.**