UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>CHRISTOPHER LISCHEWSKI,<br>Defendant. | Case No. 18-cr-00203-EMC-1<br><br>**ORDER DENYING DEFENDANT'S RULE 29 MOTION FOR ACQUITTAL**<br><br>Docket Nos. 603, 652 |

## I.    <u>INTRODUCTION</u>

On December 3, 2019, a jury returned a verdict finding Defendant Christopher Lischewski guilty of participating in a conspiracy to fix canned-tuna prices with StarKist and Chicken of the Sea. At the conclusion of the Government's case-in-chief, Defendant moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). *See* Trial Tr. at 2456:13–2470:8; Docket No. 603.[1] The Court reserved ruling on Defendant's motion. *See* Trial Tr. at 3157:13–14. Currently pending before the Court is Defendant's renewed motion for judgment of acquittal pursuant to Rule 29(c). Docket No. 652. The renewed motion offers no new argument; instead, it directs the Court's attention to the arguments and authorities cited in the original motion, as well as oral argument throughout trial. As such, this Order will refer to arguments made in the initial motion, Docket No. 603 ("Mot."), and the trial transcript.

Despite the scope of the motion's briefing being limited to challenging an agreement between Defendant and Shue Wing Chan, Defendant's argument at trial expressly indicated that

---

[1] Defendant also renewed his motion for judgment of acquittal after the close of all evidence. *See* Trial Tr. at 3157:8–3157:12.

1  he directed his Rule 29 motion against the entire overarching conspiracy involving the three
2  canned-tuna companies.² As explained below, to obtain an acquittal, Defendant must demonstrate
3  that there is insufficient evidence pertaining to an illegal agreement between (1) Bumble Bee and
4  StarKist; (2) Bumble Bee and Chicken of the Sea; *and* (3) Bumble Bee (through Defendant) and
5  Mr. Chan. The Court concludes that Defendant fails to meet his burden as to all three and, thus,
6  his Rule 29 motion is **DENIED**.

## II. SPECIAL JURY VERDICT

On December 3, 2019, the jury returned a special verdict form that read as follows: "We, the Jury, unanimously find the conspiracy to fix prices charged in Count One of the Indictment involved defendant and at least one other company, as specified below: . . . StarKist and Chicken of the Sea." Docket No. 640. In short, the jury found against Defendant on all three issues enumerated above.

## III. LEGAL STANDARD

Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for a judgment of acquittal after a jury verdict. A Rule 29 motion challenges the sufficiency of evidence. "In ruling on a Rule 29 motion, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Alarcon–Simi*, 300 F.3d 1172, 1176 (9th Cir. 2002) (emphasis in original). "[I]t is not the district court's function to determine witness credibility when ruling on a Rule 29 motion." *Id*.

## IV. MOTION FOR JUDGMENT OF ACQUITTAL

A. Agreement Between Bumble Bee, Chicken of the Sea, and StarKist

This Court previously found that the Government can obtain a conviction based on an illegal agreement between Defendant and one (not necessarily both) alleged co-conspirator: either StarKist or Chicken of the Sea. Docket No. 495. With regard to an agreement with Chicken of the Sea, specifically, this Court further ruled that "the means by which [Defendant] reached the

---

² "I'm moving for a judgment of acquittal under Rule 29 of everything." Trial Tr. at 2464:10–13.

agreement—*e.g.*, via a direct understanding with Shue Wing Chan or via Kenneth Worsham's communications with Michael White and/or John Sawyer—need not be unanimously decided." Docket No. 622. Nonetheless, out of an abundance of caution, the Court drafted a special verdict form to discern with specificity the jury's findings as to particular co-conspirators. *See Id.*, Ex. 1 at 2 (if the jury convicted solely on an agreement between Bumble Bee and Chicken of the Sea, they were directed to answer yes or no to the following, "We, the Jury, unanimously agree that there was at least one Chicken of the Sea participant in the conspiracy other than Shue Wing Chan."). As discussed below, the jury did not reach this question because it convicted based on agreements with StarKist ***and*** Chicken of the Sea.

Defendant's motion and argument at trial do not specifically challenge the sufficiency of evidence as to an agreement with Chicken of the Sea and/or StarKist (other than the Mr. Chan aspect). Indeed, the evidence at trial with regard to these two companies was legion.[3] Because Defendant's renewed motion does not enhance his initial motion with arguments directed at the evidence via-a-vis StarKist or Chicken of the Sea, the Court **DENIES** Defendant's motion for judgment of acquittal.[4] The jury verdict as to both the StarKist and Chicken of the Sea conspiracy is not subject to impeachment under Rule 29; whether there was sufficient evidence of the alleged agreement with Mr. Chan is immaterial in view of the jury's findings.

B. <u>Agreement Between Defendant and Mr. Chan</u>

Nonetheless, the Court addresses the sufficiency of evidence as to an illegal agreement with Mr. Chan. According to Defendant, "even construing the evidence in the light most favorable to the government, no rational jury could find Mr. Lischewski guilty of reaching a price-fixing agreement with Mr. Chan . . ." because "the evidence shows that the alleged Chan

---

[3] The Government lays out the evidence in its opposition to the renewed Rule 29 motion (to which Defendant did not respond). *See* Docket No. 653 ("Renewed Opp.").

[4] The Government's initial opposition, which was filed concurrently with Defendant's initial Rule 29 motion, responds with three arguments. Docket No. 604 ("Initial Opp.") at 1. First, there is sufficient evidence that Defendant participated in an overarching price-fixing conspiracy even without evidence of an agreement with Mr. Chan. *Id*. Second, Mr. Chan's agreement was not separate from the rest of the conspiracy. *Id*. Third, the jury was entitled to consider the interactions between Mr. Chan and Defendant as evidence in support of the broader conspiracy. *Id*.

3

Agreement is entirely separate from the other alleged conspiracies." Mot. at 1. Even if the verdict had rested on this agreement only, there is sufficient evidence to support the jury's verdict.

Defendant contends there could be no conspiracy with Mr. Chan because there was no agreement with mutual consent. Mot. at 1–2. Defendant relies on *United States v. Melchor-Lopez*, 627 F.2d 886 (9th Cir. 1980), where the Ninth Circuit found insufficient evidence of a mutual understanding to sustain a conviction of a conspiracy to sell narcotics. There, the court stated that "[t]he line between conspiracy and an unexercised opportunity to join a conspiracy may be difficult to draw, but it ***must*** be drawn where the existence of an agreement is absent." *Id*. at 891 (emphasis added). However, in *Melchor-Lopez*, there was evidence that unequivocally rejected mutual assent. At trial, the jury convicted two defendants (Melchor-Lopez and Kommatas) of conspiring with government informants to sell cocaine and heroin. *Id*. at 887. The problem there, however, was that these same government informants testified that there was ***no*** actual agreement with either Melchor-Lopez or Kommatas. *Id*. at 888–89. Specifically, regarding defendant Melchor-Lopez, the prosecution introduced evidence in the form of wire-tapped-telephonic transcripts in which he spoke with Noriega, a government informant, about "the possibility of arranging a sale of cocaine or brown heroin and the willingness and ability of Melchor-Lopez to supply the substances from Mexico." *Id*. at 888. When Melchor-Lopez and Noriega eventually met in Arizona with the potential buyer (Rina), the prosecution was only able to establish that "Rina wanted to buy heroin from Melchor-Lopez and that Melchor-Lopez was able and willing to sell the substance upon the satisfaction of certain conditions which he imposed." *Id*. Noriega (the informant) testified that they never reached an agreement because Rina wanted the first transaction to occur in the United States, but Melchor-Lopez insisted that he would not bring the drugs to the U.S. and, instead, required the deal to occur in Mexico. *Id*. As to defendant Kommatas, two government agents (Bachelier and Celaya) attempted to arrange a sale of drugs from Kommatas to Rina in New York. *Id*. at 899. The four met in Arizona to discuss price, quantity, quality of heroin, and the timing of the transaction. *Id*. "Neither at the meeting nor at any time thereafter did Kommatas and Rina agree to the sale of a specific amount of heroin at a particular price." *Id*.

4

The Ninth Circuit rejected the prosecution's argument that "the unmistakable inference to be drawn from this evidence is that [defendants] joined the conspiracy and acted throughout the relevant period to promote the object of the conspiracy: the importation and sale of heroin." *Id*. In so ruling, the *Melchor-Lopez* court recognized that "agreement[s] need not be explicit, but may be inferred from circumstantial evidence . . . ." *Id*. (citing *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir. 1978)). However, the court also noted that a guilty conviction cannot be from "mere association with members of a conspiracy . . . ." *Id*. The Ninth Circuit concluded that defendant Melchor-Lopez did not form an illegal agreement because the potential buyers never met his conditions. *Id*. at 891. With regard to defendant Kommatas, there was no evidence of an agreement to purchase illegal drugs; instead, there was at most an agreement to negotiate such a purchase. *Id*.

Here, Defendant argues that *Melchor-Lopez* mandates a finding that, based on the evidence presented, he never actually entered into an illegal agreement with Mr. Chan. Defendant contends it was a unilateral agreement to which only Mr. Chan was a party. In response, the Government argues that there is sufficient evidence for the jury to infer a conspiracy (and, thus, mutual assent) between Defendant and Mr. Chan. The Government relies on *Esco Corporation v. United States*, 340 F.2d 1000 (9th Cir. 1965) in which the Ninth Circuit held that an express written or oral agreement is not required to sustain a guilty conviction of conspiracy. *Id*. at 1007. Similarly, as to the mutual assent that is required to form such an agreement, it specifically stated that,

> Mutual consent need not be bottomed on express agreement, for any conformance to an agreed or contemplated pattern of conduct will warrant an inference of conspiracy. ***An exchange of words is not required. Thus not only action, but even a lack of action, may be enough from which to infer a combination or conspiracy***.

*Id*. (citations omitted) (emphasis added).

*Esco* involved numerous defendant distributors who engaged in a conspiracy to fix the price of stainless-steel pipe and tubing in the West Coast as a response to East-Coast distributors' decision to cut prices. *See Esco Corp.*, 340 F.2d at 1002. These defendants held multiple meetings, for example—

> To meet the threat posed by competition from the smaller,

> nonstocking jobbers, the defendants (including Esco), at a series of meetings held in Los Angeles and San Francisco . . . , agreed to reduce the discount to these distributors from the historic 10 percent to 5 percent. It was felt that such a reduction would substantially eliminate troublesome price-cutting and underselling by this class of distributors and yet allow them to continue in business, and at least make a small profit.

*Id*. (internal quotations and citations omitted). All of the defendants entered into pleas, except Esco; it proceeded to trial. *Id*. at 1004. At trial and on appeal, Esco argued that it was only involved in the latter two of the overall ten conspiratorial meetings, in which representatives from each alleged distributor discussed discounts, among other things. *Id*. The defendant also contended that these two meetings between competitors were lawful because there was no direct or circumstantial evidence demonstrating Esco agreed to an illegal act. *Id*. In support of this position, Esco argued the biggest competitor, Tubesales, organized the meeting to announce its own pricing plans—not to ask for an illegal agreement to not compete. *Id*. at 1006.

The Ninth Circuit rejected Esco's argument by using an example to illustrate how a conspiracy can be proven by drawing inferences of mutual assent from circumstantial evidence:

> Let us suppose five competitors meet on several occasions, discuss their problems, and one finally states—"I won't fix prices with any of you, but here is what I am going to do—put the price of my gidget at X dollars; now you all do what you want." He then leaves the meeting. Competitor number two says—"I don't care whether number one does what he says he's going to do or not; nor do I care what the rest of you do, but I am going to price my gidget at X dollars." Number three makes a similar statement—"My price is X dollars." Number four says not one word. All leave and fix 'their' prices at 'X' dollars.

*Id*. at 1007. The Court of Appeals held that, as a matter of law, the above-quoted scenario neither compels an inference of a price-fixing conspiracy, nor does it demand the finder of fact conclude that no agreement existed. *Id*. Instead, the trier of fact must "determine what inference appeals to it (the jury) as most logical and persuasive, after it has heard all the evidence as to what these competitors had done before such meeting, and what actions they took thereafter, or what actions they did not take." *Id*. With this, the court in *Esco* affirmed the district court's decision denying the defendant's motion for judgment of acquittal because there was sufficient evidence, if believed, that would show it conspired with competitors to fix prices by reducing discounts from

ten to five percent. *Id*. at 1008.

Thus, a guilty verdict for conspiring to price-fix can rest on an agreement formed by implied mutual assent. Mutual consent may be implied—and thus inferred—via conformance to an agreed pattern of actions. *Id*. at 1008.

The following is a summary of evidence presented to the jury from which an agreement between Defendant and Mr. Chan may be inferred:

- Mr. Chan testified that towards the end of a one-on-one breakfast/lunch meeting at Milton's in Del Mar, California, he told Defendant that it was not Chicken of the Sea's business strategy to price low; and Defendant said, "I appreciate it" or "Thank you." Mot. at 3 (citing Trial Tr. at 2355:1–13);

- Defendant sent various short e-mails to Mr. Chan saying, for example, "wow," "very aggressive," or "good luck." Trial Tr. 2251:19–20; 2253:19–22. These e-mails attached aggressive Chicken of the Sea advertisements that promoted ten cans of chunk-light tuna for ten dollars or, in other ads, single cans for forty-nine cents. Trial Tr. 2248:6–19. Mr. Chan testified that he understood these e-mails from Defendant to be reminders that Chicken of the Sea was selling too cheap. Mr. Chan also testified that he concurrently had telephone calls with Defendant after these e-mails (discussing various topics), and those communications indicated that "there's an understanding that we are not going to promote aggressively." Trial Tr. at 2259:1–20; and

- Mr. Chan testified that during a break at a National Fisheries Institute meeting in Chicago, Illinois, he reassured Defendant by saying, "Don't worry about this press release. It is just PR." According to Mr. Chan, Defendant felt good about it and said, "Thank you for letting me know." Mot. at 3 (citing Trial Tr. at 2373:23–2374:8).

Here, there was no direct evidence of a quid-pro-quo—*i.e.*, there was no evidence that Defendant outright said that Bumble Bee would stop pricing aggressively because Mr. Chan conveyed that Chicken of the Sea would cease aggressive pricing. However, Mr. Chan testified

7

that he understood that so long as he complied with his promise not to price over aggressively, Defendant and Bumble Bee would refrain from retaliating. That assumption was buttressed by the evidence of the overall agreements with StarKist and Chicken of the Sea on pricing. Mr. Worsham and Mr. Cameron testified that Defendant knew about their illegal agreements (*i.e.*, quid-pro-quos) with their counterparts including Chicken of the Sea through Mr. Sawyer and Mr. White. Moreover, Defendant's subsequent conduct—*e.g.*, drafting e-mails jabbing about aggressive pricing—were consistent with Mr. Chan's understanding of a tacit agreement; he was being closely monitored by Defendant and evidently feared consequences if he did not go along with the program. *See United States v. Gonzalez*, 906 F.3d 784, 792 (9th Cir. 2018), *cert. denied sub nom. Luviano v. United States*, 140 S. Ct. 159 (2019) ("A tacit agreement may be inferred from the conspirators' conduct as well as other circumstantial evidence."). This conclusion is supported by Scott Cameron's testimony that Defendant kept him appraised of conversations he had with Mr. Chan, sharing that Chicken of the Sea was "getting religion" on pricing in Q3. Initial Opp. at 5 (citing Trial Tr. at 663:13–14; Ex. 304 ["ShuWing made it a point to tell Chris that they are getting religion in q3 . . . I saw him pull Chris aside to make that point."]). The Government also admitted evidence showing how Defendant would blind copy Mr. Cameron on e-mails to Mr. Chan in which he "jabbed" about Chicken of the Sea's aggressive prices. *Id*. (citing Trial Tr. at 659:6–660:7). Therefore, the jury here was able to view "all the evidence as to what these competitors had done before such meeting, and what actions they took thereafter, or what actions they did not take." *See Esco Corp.*, 340 F.2d at 1007.

The issue before the Court is not credibility. *Alarcon–Simi*, 300 F.3d at 1176 ("[I]t is not the district court's function to determine witness credibility when ruling on a Rule 29 motion."). And conflicting evidence does not equate to insufficient evidence. *See United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1200–01 (9th Cir. 2000) (on a post-verdict Rule 29 motion, all reasonable inferences are drawn in favor of the government and all conflicts in the evidence in favor of the verdict). There was sufficient evidence of an agreement between Mr. Chan and Defendant to sustain the verdict. And as stated above, even if there was not, the jury verdict is sustained because there was ample evidence on which the jury could have found a conspiracy

8

between Bumble Bee and StarKist and/or Chicken of the Sea even without the alleged Mr. Chan agreement.

As such, the Court **DENIES** Defendant's motion for judgment of acquittal.

This order disposes of Docket Nos. 603 and 652.

**IT IS SO ORDERED**.

Dated: March 24, 2020

_____
EDWARD M. CHEN
United States District Judge